Richard B. NELLIS, et al., Appellants,

v.

Martin R. SHUGRUE, Jr., as Trustee for the Estate of Eastern Air Lines, Inc., and Air Line Pilots Association, International, Appellees.

No. 92 Civ. 8720 (SS).

United States District Court,
S.D. New York.

Jan. 24, 1994.

(C. Sanders McNew, of counsel), Caplin & Drysdale, New York City, for appellants.

James L. Linsey, Thomas N. Ciantra, Cohen Weiss and Simon, New York City, for appellee Air Line Pilots Ass'n.

(Joseph L. Manson, III, Douglas W. Hall, of counsel), Verner, Liipfert, Bernhard, McPherson and Hand, Washington, DC, for Trustee Martin R. Shugrue, Jr.

## *OPINION*

SOTOMAYOR, District Judge.

Appellants are nine former air line pilots of now-defunct Eastern Air Lines, Inc. ("Eastern"). They appeal an order dated October 23, 1992 (the "Order") of Chief Judge Burton R. Lifland of the United States Bankruptcy Court of the Southern District of New York, approving a global settlement between the Estate of Eastern, represented by the Trustee for the Estate, Martin Shugrue, Jr., and the Air Line Pilots Association, International ("ALPA"), the appellants' union and collective bargaining agent during their tenure with Eastern. For the reasons discussed below, I affirm Chief Judge Lifland's Order approving the settlement agreement.

## I. *BACKGROUND*

### A. *The Eastern Takeover and Bankruptcy Petition*

This appeal is another chapter in the long litigation history resulting from the purchase of Eastern in 1986 by Frank Lorenzo and his Texas Air Corporation ("Texas Air"). After the now famous Lorenzo takeover of Eastern, Lorenzo and Texas Air took various

steps which had severe consequences for Eastern's fiscal situation and labor relations. These actions resulted in the well-publicized and bitter struggles between Eastern's employees and the new owner.

For several years after Eastern's purchase, ALPA, on behalf of its members, initiated and conducted numerous labor grievances and lawsuits. *See, e.g., Air Line Pilots Ass'n, Int'l v. Eastern Air Lines, Inc.,* 703 F.Supp. 962 (D.D.C.), *rev'd,* 863 F.2d 891 (D.C.Cir.1988), *cert. denied,* —— U.S. ——, 112 S.Ct. 37 (1991). These lawsuits and labor grievances encompassed a broad range of issues and were filed in several jurisdictions, including Florida, Virginia and New York. The Eastern imbroglio attracted national attention.

The tensions between Eastern's management and its employees reached a climax on March 4, 1989 when the International Association of Machinists ("IAM") went on strike, supported by Eastern's air line pilots and flight attendants who launched a concomitant sympathy strike. Appellants—Richard B. Nellis, Andrew Hawkins, Stuart Hughes, Edward J. Breen, Jr., Raymond T. Burke, Edward L. Fugate, Fred K. Testa, William T. Gaffney and Vincent G. Brocklebank—were intimately involved in the strike.

Within days of the strike commencing, on March 9, 1989, Eastern filed in this court for reorganization under Chapter 11 of the Bankruptcy Code. The bankruptcy filing stayed ALPA's pending lawsuits and grievances against Eastern and opened another chapter in the parties tumultuous history. Eastern's financial status continued to deteriorate and, finally, in January 1991, Eastern terminated all flight operations and commenced liquidation of its assets.

Eastern, under the Trustee's supervision, and ALPA attempted to negotiate their outstanding disputes. This was no easy task, in part due to the hostile relationship which had developed between labor and management during the Lorenzo years. Nevertheless, in August 1991, Eastern and ALPA reached a tentative settlement, in which ALPA agreed to dismiss all of its pending lawsuits and grievances and all individual pilot grievances against Eastern. In return, Eastern agreed to pay ALPA a lump sum and the Trustee agreed to try to place 360 of Eastern's former pilots in new positions by December 31, 1991. The tentative settlement failed, however, when the Trustee was unable to secure work for the pilots. Several of the appellants served on ALPA's then controlling council, known as the Eastern Master Executive Council ("MEC"),[1] when it negotiated the tentative settlement. On January 1, 1992, shortly after the tentative settlement failed, the MEC came under ALPA's custodianship and that custodianship controlled the negotiations which led to the settlement at issue before me.

### B. *The 1992 Settlement*

In July 1992, Eastern and ALPA reached the settlement which Chief Judge Lifland approved and the appellants now challenge. This settlement is contained in a complex and comprehensive agreement which resolves almost all of the outstanding lawsuits and grievances between the parties.[2]

Briefly summarized, the settlement agreement provides that Eastern will pay ALPA $29.5 million and an additional 10% of any recovery in two lawsuits pending against unrelated third parties. In return, ALPA will terminate several ALPA lawsuits and grievances. Certain pre- and post-petition individual pilot grievances survive the settlement and are preserved during a window period when pilots may assert their claims in the bankruptcy court.

#### 1. *The Settlement Provisions*

Under the settlement agreement, ALPA and Eastern will withdraw, with prejudice,

---

1. For example, appellant Edward L. Fugate served as vice chairman of the MEC from 1990–91 and appellant William T. Gaffney was a MEC member from 1987–90.

2. Eastern and ALPA entered into a companion settlement agreement resolving notice and furlough pay claims under the parties' collective bargaining agreement. Under this settlement agreement, ALPA released its claims for $22 million—$15 million settled the furlough pay claims and $7 million the notice pay claims. The approval of this settlement agreement by Chief Judge Lifland is not currently before me and I do not address it herein.

**118**

ten pending lawsuits which raise diverse issues including RICO and pay parity claims.[3] The damages sought in these actions are in the millions of dollars. Although the vast majority of ALPA's group claims are to be withdrawn, ALPA preserves its vacation pay claim, and its furlough and notice pay claims pending in a Florida district court action for pilots entitled to reinstatement under an August 2, 1990 district court order.[4] It also maintains the right to proceed on a severance claim to be adjudicated in bankruptcy court pursuant to an Eleventh Circuit decision issued in 1990.[5] Additionally, ALPA preserves its litigations and claims against other non-Eastern entities, including Texas Air, Continental Airlines, Inc. and Continental Holdings Corp.

The settlement agreement would also require ALPA to withdraw, with prejudice, about thirty postpetition group grievances brought after the bankruptcy petition was filed, allowing, however, for the litigation of certain individual pilot claims. The group grievances in, or seeking, arbitration will be similarly withdrawn.

Individual claims in arbitration grievances, however, will be preserved, if the individual pilot claimant files a bankruptcy claim within

40 days of the submission of the settlement agreement to the bankruptcy court for approval. The settlement agreement, however, contains an escape clause by which Eastern may unilaterally terminate the agreement if postpetition grievances exceed $1.45 million in administrative expenses or postpetition damages. Moreover, should the bankruptcy court not adjudicate the grievances within the time frame set forth in the settlement agreement, both Eastern and ALPA have the option of terminating the agreement.

The settlement agreement also preserves prepetition pilot grievances which challenge an individual pilot's termination if the pilot has not had a System Board Adjustment hearing on the grievance. The agreement provides that these pilots can elect to proceed with a hearing before an arbitrator or convert the termination to a resignation and have the grievance treated as a priority wage claim. Pilots with postpetition grievances that have not been submitted to the System Board Adjustment process may also choose to have an arbitration hearing or convert the termination to a resignation. Pilots have 60 days once the settlement is filed for bankruptcy court approval to elect one of these options.

**3.** ALPA's Summary of Postpetition ALPA Grievances lists the following cases: 1) *Air Line Pilots Association v. Eastern Air Lines, Inc.*, Civ. No. 87–2002–BDP (D.D.C.); Appeal No. 88–7201 (D.C.Cir.); No. 88–1403 (S.Ct.); Appeal No. 88–7272 (D.C.Cir.); Case No. 91–5110 (2d Cir.)—Asset Transfer case, K.C. shutdown appeal and petition for cert re same, and sale of Shuttle appeal and appeal from automatic stay relief denied; 2) *Air Line Pilots Association v. Eastern Air Lines, Inc.*, No. 90–1961–Civ–Kehoe (S.D.Fla.); *Eastern Air Lines, Inc. v. Air Line Pilots Association*, 105 B.R. 773 (Bankr.S.D.N.Y. 1989); *In re Ionosphere Clubs, Inc. and Eastern Air Lines, Inc.*, Adv.Pro. No. 89–6143 A; 89–7563–RWS—Wet Lease Litigation; 3) *Eastern Air Lines, Inc. v. Air Line Pilots Association*, 744 F.Supp. 1140 (S.D.Fla.); 90–5658 (11th Cir.); 90–1902 (S.Ct.)—Trainee Litigation; 4) *Eastern Air Lines, Inc. v. Air Line Pilots Association*, 105 B.R. 773 (Bankr.S.D.N.Y.) (*In re Ionosphere Clubs, Inc. and Eastern Air Lines, Inc.*), Adv.Pro. No. 89–6590 A (Bankr.S.D.N.Y.); *Eastern Air Lines, Inc. v. Air Line Pilots Association*, No. 89–Civ.–8250 (MBM), 1990 WL 5203 (S.D.N.Y.)—Section 28 Bid Litigation; 5) *Texas Air Corp. and Eastern Air Lines, Inc. v. Air Line Pilots Association and International Association of Machinists*, No. 88–0840–Civ–Hoeveler (S.D.Fla.); *Eastern*

*Air Lines, Inc. v. Air Line Pilots Association*, 105 B.R. 773 (Bankr.S.D.N.Y.) (*In re Ionosphere Clubs, Inc. and Eastern Air Lines, Inc.*), Adv.Pro. No. 89–6468 A—RICO Litigation; 6) *Air Line Pilots Association and C. Copeland v. Eastern Air Lines, Inc.*, 89 B 10448 and 89 N 10449 (BRL) (Bankr.S.D.N.Y.) (*In re Ionosphere Clubs, Inc. and Eastern Air Lines, Inc.*), Adv.Pro. No. 89–5692 A—New York State Litigation; 7) *ALPA, Copeland & Mogus v. Eastern, Shugrue, Tegtman & Honahan*, Case No. 90–1642–Civ–Nesbitt (S.D.N.Y.Fla.)—Eastern's failure to process grievances; 8) *Shugrue v. Air Line Pilots Association*, Adv.Pro. No. 90–6242A (Bankr.S.D.N.Y.)—Adversary proceeding mirroring case 7 above; 9) *In re Ionosphere Club and Eastern Air Lines, Inc.*, No. 90–8065 (RJW) (S.D.N.Y.)—Section 1113(e) appeal; 10) *Air Line Pilots Association v. Eastern Air Lines, Inc. and Shugrue*, No. 91–Civ–3671 (RWS) (S.D.N.Y.)—Gibson, Kunstler, Brennan severance challenge.

**4.** *Eastern Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 744 F.Supp. 1140 (S.D.Fla.1990).

**5.** *Eastern Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 744 F.Supp. 1140 (S.D.Fla.), *aff'd*, 920 F.2d 722 (11th Cir.1990).

The parties have also agreed that pilots can pursue individual claims in bankruptcy court upon filing a bankruptcy claim within 40 days of the submission of the settlement to the bankruptcy court. Additionally, the settlement agreement preserves the right of any individual pilot to proceed with a claim against Eastern which is not duplicative of the claims settled under the agreement.

Finally, under the settlement agreement, Eastern will pay ALPA a $29.5 million lump sum and another 10% of any monetary recovery Eastern obtains in two pending lawsuits. One lawsuit is against Eastern's insurance companies, and the other against the General Services Administration of the federal government. Eastern has also agreed to withdraw its litigation against the Pension Benefit Guaranty Corporation, in which it seeks $200 million from the Eastern pilots' pension plan. Eastern has also promised to schedule approximately $50 million in uncontested pilot prepetition claims based on a grievance by ALPA over pay parity. Eastern will further withdraw its challenges to state unemployment benefits granted to Eastern strikers for the 1989 pilot strike.

## 2. *The Settlement Fund Disbursement*

The settlement agreement designates ALPA as the entity responsible for the distribution of the settlement fund amongst ALPA's members. In order to properly determine individual recoveries and effectively distribute the settlement fund, ALPA will establish an internal distribution process which will develop a disbursement formula. Pursuant to the distribution process, ALPA's disbursement formula will be submitted to a neutral labor relations professional and the pilots for consideration. The pilots will then have an opportunity to comment, object, raise errors and submit alternatives to the neutral labor relations professional who will thereafter recommend a final distribution formula.

6. The *Nellis* case involved a duty of fair representation challenge based on ALPA's alleged failure properly to represent the interests of the pilot class throughout Eastern's dissolution. The Virginia district court granted ALPA summary judgment on March 3, 1993. *See Nellis v. Air Line*

## C. *The Settlement Hearing*

Chief Judge Lifland set a hearing for October 23, 1992, to consider the settlement agreement and objections thereto. Written objections to the agreement were due by October 9, 1992. The Trustee sent notices of the hearing to the 5,033 former Eastern pilots affected by the settlement. The notices informed the pilots of the date and location of the October 23rd hearing and of the procedures for raising objections. They also included copies of the settlement agreement and a postpetition grievance form, and set forth the procedures for filing postpetition claims with the bankruptcy court.

Appellants subsequently contacted ALPA and raised questions about the settlement, particularly about ALPA's intended fund distribution plan. Appellants, however, did not proceed with discovery.

On October 9, 1992, appellants filed their objections, as individuals and as representatives of the class of pilots certified in another action in the Eastern District of Virginia, *Nellis et al. v. Air Line Pilots Association, International et al.*, Civ. No. 92–771–A (E.D.Va.). The Virginia district court had certified a class of all Eastern pilots who honored the strike until its termination on November 22, 1989.[6]

Appellants challenged the settlement agreement before the bankruptcy court on the following grounds: 1) ALPA was unauthorized to settle the claims contained in the agreement; 2) the settlement did not protect individual pilots' rights to pursue individual claims; and 3) the settlement failed to provide a sufficiently detailed distribution plan setting forth the precise disbursement of funds for individual pilots.[7]

In response to the appellants' objections, ALPA sent them and the bankruptcy court a description of the distribution plan. ALPA also sent the appellants a summary and copies of all postpetition grievances and a

*Pilots Assoc. et al.*, 815 F.Supp. 1522 (E.D.Va. 1993).

7. The appellants did not object to the companion settlement which resolved the claims for notice and furlough pay. *See supra* note 2.

summary of prepetition grievances resolved by the settlement agreement.

At the October 23rd hearing, counsel for the Trustee urged the bankruptcy court to approve the settlement because it provided a reasonable resolution of the outstanding litigations, satisfying ALPA's claims, as well as maintaining sufficient financial resources to satisfy the remaining creditors. The Trustee estimated that the exposure to the Estate of various outstanding ALPA litigations was $24.6 million on two major pay issues. He then calculated an additional $5 million contingency amount for other ALPA litigations.[8] Thus, according to the Trustee's counsel, the settlement fund of $29.5 million was fair and adequate and within the liquidation analysis prepared by the Trustee and his staff.

In addition to argument from counsel, the bankruptcy court heard directly from the Trustee and the Unsecured Creditors Committee who supported the settlement. The Trustee maintained that the settlement would not prejudice the rights of other creditors and that, in his opinion and based on his knowledge of the Estate's litigations and grievances, the settlement was fair to the Estate and its creditors.

During examination by appellants' counsel, the Trustee admitted that although he had reviewed all of the individual claims encompassed by the settlement agreement, he did not always have sufficient facts on each one to estimate the liability for each claim. Nevertheless, the Trustee believed that his assessment and conclusions as to the fairness of the settlement amount were well founded and warranted under the circumstances as he knew and had experienced them.

A. In answering your question with respect to how we estimated what exposures to the estate could be financially [sic], we had a contingent account established in the liquidation analysis and we had in our minds earmarked about $5 million as possible economic exposure due to other ALPA litigation.

Q. Can you tell me, Mr. Shugrue, how you came up with that number?

A. A general assessment of what we thought the risks might be.

Q. Do I take it from your answer that you did not perform a claim by claim analysis?

A. As I indicated earlier, no, we did not do that.

Q. What went into that formulation of that general assessment?

A. Twenty-five years of experience in dealing with ALPA.

Q. So you made this assessment yourself?

A. I and my staff who also have twenty-five years of experience dealing with ALPA.

Q. You formed this, though, without going over the individual claimants in order to reach this general assessment?

A. No, we went over each individual claim. As indicated by counsel earlier, in many cases sufficient facts were not developed to estimate precisely on a claim by claim basis what the exposure would be.

Q. Was there enough information to estimate, even generally, what the exposure might be on any particular claim?

A. I think the short answer is no, otherwise we would have done it. And I will just refer to what I said before.

Bankruptcy Court Hearing, October 23, 1992, pp. 33–34.

Counsel for the Unsecured Creditors Committee stated that, despite the concerns raised by appellants,

the fact of the matter is the economics of this deal, in light of all of the issues that would have to otherwise be dealt with, makes good sense for the Eastern estate and therefore the deal should be approved, in our view.[9]

*Id.* at 53. The Special Advisor also informed the court that he approved the settlement.

---

8. With respect to the $22 million settlement on the furlough and notice pay claims, the Trustee's counsel stated that they had calculated their furlough liability at $16.6 million and the notice pay liability at $7.8 million, for a $24.2 million total.

9. The sole concern raised by the Committee at the hearing was that ALPA might be paid prior to the resolution of any potential appeals.

At the hearing, ALPA expressed its support for the settlement and informed the Court that

> [t]he difficulty that the Trustee has in litigating and dealing with the various constituencies is nothing compared to ALPA's sensitivity to its representation legally of the interests of all of those constituencies. We believe that this settlement agreement is a fair balance to try to put money in the hands of individuals that need it as soon as possible.

*Id.* at 52.

At the conclusion of the hearing, the bankruptcy court approved the settlement agreement finding that it did "not fall below the lowest point in the range of reasonableness." The court also concluded that the settlement was "fair and equitable and in the best interests of Eastern's estate and its creditors." The court rejected the appellants' objections finding that ALPA had authority to settle with Eastern. The court observed that ALPA did not have to secure approval of the settlement from all individual pilots because it represented the group in its capacity as a union, and that any dissatisfied pilot could proceed against ALPA for violation of its duty of fair representation under federal law. Chief Judge Lifland further noted that appellants had consented to ALPA representation because some of the appellants had actively negotiated the earlier agreement with Eastern as members of MEC.

In response to the appellants' argument that the settlement could not be approved without a detailed distribution plan, Chief Judge Lifland, relying on *In re Drexel Burnham Lambert Group, Inc.,* 130 B.R. 910 (Bankr.S.D.N.Y.1991), *aff'd,* 960 F.2d 285 (2d Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993), and *In re Agent Orange Product Liability Litigation,* 818 F.2d 145 (2d Cir.1987), *cert. denied,* 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988), held that it was not necessary to have fixed distribution amounts prior to the approval of the settlement.

The court also rejected and denied appellants' oral request for class certification as representatives of Eastern's former pilots. The court determined that appellants had failed to seek certification pursuant to Bankruptcy Rule 7023 and that they had not demonstrated that they could satisfy the certification requirements of that rule. Nevertheless, the court concluded that the potential class members had disparate interests which, in any event, precluded class certification.

### D. *Appellants' Objections on Appeal*

On appeal appellants challenge the bankruptcy court's approval of the settlement agreement on three grounds: 1) the bankruptcy court did not have sufficient information before it concerning each claim which the agreement settled to assess adequately the fairness of the settlement to the appellants and other creditors; 2) the settlement agreement should not have been approved without a formula or plan for the allocation of funds among claimants; and 3) approval of the settlement agreement should not be affirmed because appellants did not have a meaningful opportunity to be heard before the bankruptcy court. These objections are without merit.

## II. *STANDARDS FOR APPROVING A SETTLEMENT AND REVIEW OF THE BANKRUPTCY COURT'S DECISION*

 Pursuant to the Federal Rules of Bankruptcy Procedure,

> [o]n motion by the trustee and after a hearing on motion to creditors, the United States trustee, the debtor and indenture trustees as provided in Rule 2002 and to such other entities as the court may designate, the court may approve a compromise or settlement.

Bankr.Rule 9019(a), 11 U.S.C. (Supp.1993). The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it. *In re Drexel Burnham Lambert Group, Inc.,* 134 B.R. 499, 505 (Bankr.S.D.N.Y.1991), citing *In re Energy Co-op., Inc.,* 886 F.2d 921 (7th Cir.1989). The court need not "decide the numerous questions of law and fact raised by appellants but rather [must] canvass the issues and see whether the settle-

ment 'fall[s] below the lowest point in the range of reasonableness.'" *In re W.T. Grant Co.,* 699 F.2d 599, 608 (2d Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983), quoting *Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.), *cert. denied sub nom. Benson v. Newman,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972).

The Supreme Court has stated that in determining a settlement's fairness and equity, a judge should:

> apprise [him or herself] of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties in collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise.

*Protective Comm. for Indep. Stockholders of TMT Trailor Ferry, Inc. v. Anderson,* 390 U.S. 414, 424, 88 S.Ct. 1157, 1163–64, 20 L.Ed.2d 1 (1968).

Relying on the guiding language of *TMT Trailor,* this Circuit has set forth various factors to be considered on a Rule 9019(a) motion: (1) the probability of success in the litigation; (2) the difficulties associated with collection; (3) the complexity of the litigation, and the attendant expense, inconvenience, and delay; and (4) the paramount interests of the creditors. *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 292 (2d Cir.1992), *cert. dismissed,* —— U.S. ——, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993); *In re Ionosphere Clubs, Inc.,* 156 B.R. 414, 428 (S.D.N.Y.1993); *see also In re Purofied Down Products,* 150 B.R. 519, 522, citing *Drexel v. Loomis,* 35 F.2d 800, 806 (8th Cir.1929).

■ Courts of this district have further elaborated on the factors which a bankruptcy court should consider in deciding whether to approve a settlement. Courts should consider:

1) The balance between the likelihood of success compared to the present and future benefits offered by the settlement;

2) Prospect of complex and protracted litigation if settlement is not approved;

3) Proportion of the class members who do not object or who affirmatively support the proposed settlement;

4) The competency and experience of counsel who support the settlement;

5) The relative benefits to be received by individuals or groups within the class;

6) The nature and breadth of releases to be obtained by officers and directors; and

7) The extent to which settlement is the product of arm's length bargaining.

*In re Frost Bros., Inc.,* No. 91 Civ. 5244, 1992 WL 373488, *4 (S.D.N.Y. December 2, 1992) (relying on *In re Texaco Inc.,* 84 B.R. 893, 902 (Bankr.S.D.N.Y.) (citations omitted), *appeal dismissed,* 92 B.R. 38 (S.D.N.Y.1988)).

■ Finally, a bankruptcy court may consider the opinions of the trustee or debtor and their counsel that the settlement is fair and equitable. *In re Purofied Down Products,* 150 B.R. at 522; *In re Drexel Burnham,* 134 B.R. at 505. *See also In re International Distribution Centers, Inc.,* 103 B.R. 420, 422–23 (S.D.N.Y.1989); *In re Carla Leather, Inc.,* 44 B.R. 457, 466 (Bankr. S.D.N.Y.1984), *aff'd,* 50 B.R. 764 (S.D.N.Y. 1985). A court may also consider the competency and experience of counsel supporting the settlement. *In re Frost Bros.,* 1992 WL 373488, *4, citing *In re Texaco,* 84 B.R. 893.

■ However, a bankruptcy court must make an independent determination when approving a settlement. *In re Ionosphere Clubs, Inc.,* 156 B.R. 414, 426 (S.D.N.Y.1993). A bankruptcy judge cannot "accept the trustee's word that the settlement is reasonable, nor may [the judge] merely 'rubber stamp' a trustee's proposal." *Id.* at 426, citing *In re Energy Co-op., Inc.,* 886 F.2d at 924. The bankruptcy judge is ultimately responsible for an unbiased and informed assessment of a settlement's terms. *See TMT Trailor,* 390 U.S. at 424, 88 S.Ct. at 1163–64, 20 L.Ed.2d 1; *Plummer v. Chemical Bank,* 668 F.2d 654, 659 (2d Cir.1982). However, a court should not conduct a "mini-trial" on the merits. *In re Blair,* 538 F.2d 849, 851 (9th

Cir.1976); *In re Purofied Down Products,* 150 B.R. at 522.

■ My review of the bankruptcy court's approval of the extant settlement agreement is restricted to determining whether there was a clear abuse of discretion. *In re Drexel Burnham,* 960 F.2d at 292; *see also In re Ionosphere Clubs, Inc.,* 156 B.R. at 426–27; *In re Purofied Down Products,* 150 B.R. at 522; *In re Frost Bros.,* 1992 WL 373488 at \*4. The experience and knowledge of the bankruptcy court judge is of significance in assessing the propriety of the settlement. *In re Drexel Burnham,* 960 F.2d at 293. I am also cognizant of the general rule that settlements are favored and, in fact, encouraged by the approval process outlined above. *See In re New York, N.H. & H. R.R. v. Smith,* 632 F.2d 955, 959 (2d Cir.), *cert. denied sub nom. Barry v. American Financial Enterprises, Inc.,* 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980); *In re Purofied Down Products,* 150 B.R. at 522–23; *In re Frost Bros.,* 1992 WL 373488 at \*6; *In re Drexel Burnham,* 134 B.R. at 505. Applying these standards, and based on the facts before me, I do no find that Chief Judge Lifland abused his discretion in approving the Eastern/ALPA settlement agreement.

### III. *APPELLANTS' OBJECTIONS TO THE BANKRUPTCY COURT'S APPROVAL OF THE SETTLEMENT*

I address the appellants' objections raised in this appeal *seriatim.*

#### A. *Sufficiency and Adequacy of the Settlement*

■ The appellants' charge that the bankruptcy court did not have sufficient information about the individual claims resolved by the settlement agreement to assess properly its fairness to the appellants and other creditors. Appellants' theory appears to be that the court must be aware of the particulars of each respective claim resolved by a settlement agreement before approving the agreement. Without this detailed information about the claims to be settled here, appellants argue, the bankruptcy court could not have properly determined whether the

$29.5 million settlement fund is sufficient and a fair compromise.

The Settlement does not state whose suits and grievances are being settled, nor the subject of those disputes, nor their likelihood of success, nor the amounts in controversy, nor the amounts individuals, or groups of individuals, might expect to receive under the Settlement. Appellants and the court are left without even the most basic information by which to determine whether the compromise of those suits and grievances for $29.6 million is fair to them.

Appellants' Brief, p. 17.

■ Appellants misperceive a bankruptcy court's obligations. A bankruptcy judge's sole and exclusive responsibility is to determine whether a settlement is fair and in the best interests of the estate. Although a judge must consider the fairness of the settlement to the estate and its creditors, the judge is not required to assess the minutia of each and every claim. The bankruptcy judge does not have to decide "the numerous questions of law and fact raised by appellants...." *W.T. Grant,* 699 F.2d at 613. The court need only canvass the settlement to determine whether it is within the acceptable range of reasonableness. *Id.* at 608.

■ Moreover, in assessing the fairness of the settlement, a judge does not have to be convinced that the settlement is the best possible compromise or that the parties have maximized their recovery. As this Circuit has clearly stated, "the task of the bankruptcy judge was not to determine whether the settlement was the best that could have been obtained, something that neither [the judge] nor we can ever know...." *Id.*

■ Appellants' argument that I should treat their claims as those in a class action does not change the inquiry before me. Approval of a settlement in a class action case is also subject to rejection only if there is a clear abuse of discretion. *In re Ivan Boesky Sec. Litig.,* 948 F.2d 1358, 1368 (2d Cir.1991). When a class is certified and a settlement approved simultaneously, or certification is granted after approval of the set-

tlement, then the court must allow for a rigorous scrutiny "of the fairness, reasonableness and adequacy of both the negotiation process and the proposed settlement." *See In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir.1992).

■ Even under this standard, however, there is no requirement that a court must know or estimate the potential recovery for each class member. *Cf. In re Ivan F. Boesky Sec. Litig.*, 948 F.2d at 1368–69 (approving class action settlement even when recovery for some class members was uncertain because nonsettling defendants' claims were unknown).

The facts known to the bankruptcy court here are analogous to those relied upon by other courts in approving global settlement between multiple claimants and a debtor. For example, in *In re Drexel Burnham*, 960 F.2d 285, the court approved a settlement which divided $350 million between two subclasses of claimants after the court found that the complexity of the claimants' litigations, the defendant's limited recovery fund and the potential for depletion of the fund by ongoing litigation compelled approval.

> This is a complex case. There are many plaintiffs trying to maximize their own recovery, and there is a defendant with a limited fund to satisfy all claims. Prolonging the negotiation process will increase Drexel's litigation costs, with a consequent decrease in the size of the fund. Class counsel are amply experienced in complex securities cases, and have analyzed countless documents and depositions to determine the amount of Drexel's assets and the strength of the class' claims. The negotiation process involved lengthy arms-length discussion between the class counsel, Drexel, and Drexel's Fixed Creditors. The district court extensively supervised the negotiations. Finally, it is doubtful that Drexel could withstand greater exposure than that already enumerated in the Settlement Agreement.

*Id.* at 292–93.

In *In re Agent Orange*, 818 F.2d 145 (2d Cir.1987), *cert. denied sub nom. Pinkney v. Dow Chemical Co., et al.*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988), the Second Circuit, for reasons similar to those considered in *In re Drexel Burnham*, determined that the lower court had properly approved a $180 million settlement despite the appellants' arguments that the settlement was inadequate for the over 200,000 claimants who would share in the fund.

The factors considered by the courts in *In re Drexel Burnham* and *In re Agent Orange* exist here in the Eastern situation. None of the parties dispute that the Estate has limited assets from which to satisfy its creditors. With limited funds available, it is in the best interests of the Estate and the parties to reach closure on the ALPA lawsuits and individual claims at the earliest possible moment, avoiding additional litigation costs and leaving sufficient assets to satisfy some of the remaining claims of other creditors. As the bankruptcy court recognized, there are obvious risks and expenses attached to the ongoing Eastern/ALPA lawsuits and grievances, involving numerous claimants and various claims, often with complicated factual histories and legal arguments.

By settling with ALPA, Eastern resolves numerous group and individual claims, within its estimated liquidation analysis, and without sacrificing the resources necessary to satisfy other creditors. ALPA, in turn, secures a recovery faster than if the parties had proceeded with ALPA's outstanding lawsuits, and avoids the uncertainties and costs of litigation.

My review of the record satisfies me that the bankruptcy court was adequately apprised of the elements of the settlement and the nature of the compromises set forth therein. The Joint Motion submitted to the bankruptcy court and the parties contained a comprehensive and thorough description of the settlement agreement, including the lawsuits and grievances resolved and preserved by the parties. This description adequately apprised the court generally of the nature and types of claims at issue.

I, like the Second Circuit in *In re Drexel Burnham*, value the experience and knowledge of the bankruptcy court judge in assessing the propriety of the settlement.

We will defer to the district court's management of the case, particularly because the district judge has had substantial experience in supervising complex securities cases. He has presided over both the SEC action against Drexel, and other cases involving Drexel and its former officers and directors. He knows the difficulties the class has had in proving its claims, and is aware of Drexel's financial straits. Thus, we will not second-guess his decision to allows the SLCG alone to negotiate with Drexel.

*In re Drexel Burnham,* 960 F.2d at 293; *see also In re Agent Orange,* 818 F.2d at 170–71 ("Our role in scrutinizing the approval of the settlement is limited in light of the district court's extensive knowledge of the parties and their respective cases." Approval of a settlement under such circumstances should be reversed only when a "clear showing" has been made that the District Court abused its discretion.).

Chief Judge Lifland's four year history with the parties and the Eastern bankruptcy is legend. There is no question that Judge Lifland was well informed and knowledgeable about the extensive litigation between the parties. Judge Lifland has presided over the Eastern Chapter 11 petition since its inception and has overseen the rise and fall of prior settlements. He has, in addition, approved other settlements which have been upheld by this court on appeal. *See, e.g., In re Ionosphere,* 156 B.R. 414 (S.D.N.Y.1993) (district court upheld Chief Judge Lifland's approval of a settlement between Eastern and Continental Airlines, Inc., challenged by ALPA and IAM). Judge Lifland also approved the pay parity settlement between ALPA and Eastern. Thus, Judge Lifland is thoroughly familiar with the parties and their financial standing. His particular expertise in this matter and his understanding of the intricacies of the settlement and its impact on all of the parties provides ample support for the settlement's approval, particularly when the contingency amounts being set on the individual claims were set both by a Trustee, and counsel, experienced with the disputes between the parties.

To the extent appellants challenge the settlement as insufficient, on its face, to satisfy the individual claims, they misunderstand the interests at stake at the Rule 9019(a) hearing. Certainly, from ALPA's perspective, Eastern's continued fiscal depletion is a serious consideration in entering into the settlement agreement. The continuing decrease in the Estate's limited assets and its depletion prior to any resolution of ALPA's disputes can result in ALPA's members being left without any recovery. ALPA, thus, seeks to maximize the recovery for its members before the Estate is drained of its assets. Both parties want to resolve ALPA claims and take from the well before it runs dry. Appellants, however, have failed to demonstrate that the settlement is inadequate, and I can find nothing in the record that establishes that it is insufficient. As discussed above, there is nothing in the law which requires that claimants in a bankruptcy proceeding receive a full recovery through a settlement.

██ Appellants here are indirectly arguing that the settlement may be "poor" or a "bad deal," because the individual claims have not been quantified. Appellants, however, forget that it is their burden to prove that the bankruptcy court abused its discretion and they have failed to show that here in the context of the factors the bankruptcy court did consider—the nature and types of claims at issue, the burdens and uncertainties of the claims, the depleting nature of Eastern's assets, and the opinions of the parties, the Trustee and counsel—the court erred. Appellants' concede, after all, that the Union is the proper entity to negotiate on their behalf.

> Appellants do not dispute that ALPA has authority to act as a collective bargaining agent in Appellants' behalf, and that ALPA has the right to negotiate settlements to lawsuits and grievances it files on its members' behalf.

Appellants' Brief, p. 27.

The claims asserted by ALPA, and resolved in the settlement, are ALPA claims, initiated by ALPA as the representative of its pilot members, including appellants. ALPA may properly negotiate those claims

and, as the bankruptcy court noted, appellants have their recognized contractual remedy for violation of the duty of fair representation if the Union breaches that duty. The bankruptcy court, however, did not abuse its discretion in approving the settlement agreement, recommended by the Union after negotiation at arms-length and supervised by the Trustee, his counsel and the Special Advisor to the court.

### B. *The Propriety of the Fund Distribution*

 Appellants also challenge the proposed ALPA-designed fund distribution plan because it lacks specificity. The Second Circuit, however, has held that there is "no absolute requirement that [a settlement distribution] plan be formulated prior to notification of the class." *In re Agent Orange*, 818 F.2d at 170, citing *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 223–24 (5th Cir.1981), *cert. denied*, 456 U.S. 998, 102 S.Ct. 2283, 73 L.Ed.2d 1294 (1982). Approval of a settlement can predate the determination of individual awards under the distribution plan. *Id.* at 158; *see also In re Drexel Burnham*, 960 F.2d 285 (affirmance of a settlement in which the company placed settlement monies in a fund for future distribution on a percentage basis to two subclasses of claimants).

Therefore, I concur with Chief Judge Lifland that there is no abuse of discretion in approving the distribution plan as described in the settlement agreement, when it contains a fair division of the settlement funds with input from the affected pilots and ultimate resolution of the distribution scheme by an outside neutral party.

### C. *Notice and Opportunity to be Heard*

Appellants third claim—that they were not provided with adequate notice and opportunity to be heard before the settlement was approved—is absurd. The notice sent to appellants included the settlement agreement as well as information about the procedure for converting and litigating individual grievances before the bankruptcy court. The appellants submitted written objections to the settlement agreement and then received further information from Eastern and ALPA in response to those objections. Appellants did not seek and were not precluded from seeking discovery on any of the matters encompassed by the settlement agreement or any of the claims it settled. At the hearing before Judge Lifland, appellants had ample opportunity to present their arguments and to examine the Trustee. Thus, appellant's objections were fully developed, and presented to and heard by the bankruptcy court. There is simply no basis for appellants' claim that they were denied notice or an adequate opportunity to be heard.

### D. *Class Certification*

Lastly, I also find that the bankruptcy court properly denied appellants' request for class certification. The oral request for such certification at the October 23rd hearing was the first and only request for class status. As noted by Chief Judge Lifland, the request wholly failed to establish the prerequisites for class recognition as set forth in Bankr. Rule 7023 and Fed.R.Civ.P. 23. Appellants' lone reliance on class certification in the Virginia district court case is insufficient to satisfy their burden in this district on the claims in this bankruptcy action.

## IV. *CONCLUSION*

Having reviewed the record before me and considered the parties' arguments, I conclude that the bankruptcy court judge had sufficient information before him in approving the settlement agreement. Appellants' have failed to prove that the bankruptcy court abused its discretion.

For the reasons stated herein, the Order of the bankruptcy court approving the settlement agreement is **AFFIRMED**.

**SO ORDERED.**