MEMORANDUM-DECISION APPROVING A PROPOSED SETTLEMENT AS FAIR, REASONABLE AND ADEQUATE
 

 CORNELIUS BLACKSHEAR, Bankruptcy Judge.
 

 In this consolidated litigation, the parties seek approval of a proposed settlement pursuant to Bankruptcy Rule 9019(a). The settlement is designed as a global eompromisé of all litigation between securities claimants against Hibbard Brown & Co., Inc. (“Hibbard Brown” or the “Debtor”) and certain of its former officers and employees. For the reasons provided below, the court finds the terms of this settlement to be’fair, reasonable and adequate, and orders final judgment thereof.
 

 BACKGROUND
 

 Hibbard Brown was a full-service broker-dealer, registered with the Securities and Exchange Commission (the “SEC”) and the National Association of Securities Dealer, Inc. (the “NASD”). Hibbard Brown conducted its former stock brokerage activities from 12 branch offices nationwide and a corporate headquarters located in Manhattan.
 

 On October 14, 1994, (the “Filing Date”), Hibbard Brown voluntarily filed for relief with this Court, under Chapter 11 of Title 11 of the United States Code (the “Bankruptcy Code”). Although the Debtor’s assets are being liquidated, it continues to operate its business and manage its properties as a
 
 *44
 
 debtor in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. During the pendency of these bankruptcy proceedings, the Debtor paid its administrative expenses from its existing estate. Prior to the Filing .Date, approximately 4,100 registered representatives were associated with the Debtor. By the time Hibbard Brown ceased operating as a broker dealer, however, it had approximately 500 registered representatives.
 

 On February 13, 1997, to facilitate settlement, this Court certified a mandatory non-opt-out class (the “Bankruptcy Class”), pursuant to Rule 7023 of the Federal Rules of Bankruptcy Procedure (“Bankruptcy Rules”). The Bankruptcy Class included all persons who pm-chased securities from or through the Debtor between September 30, 1989 and September 30, 1995. Approximately 80% of the Bankruptcy Class are members of a New Jersey class action (the “New Jersey Class”).
 
 [1]
 
 To date,' the members of the Bankruptcy Class consist of approximately 160,000 individuals with total existing claims of approximately $6.9 to 8.4 million dollars collectively against the Debtor, Richard Brown (“Brown”) and its former registered representatives. However, according to Laurence Storch, the court examiner (the “Examiner”), potential claims may exceed $250 million.
 
 [2]
 

 Investor arbitration and litigation claims asserted against Brown alone are approximately $463,924.00. Brown’s 1995 financial statement reveals that his assets are approximately $340,000. In the first year of these proceedings, Brown earned a salary of $117,-000 from which he supported his four children and estranged spouse.’ Due to the Debtor’s diminished estate, however, Brown’s salary was significantly reduced in 1996 and ceased altogether earlier this year.
 

 Initial Proposed Settlement Provision
 

 Attorneys for the Bankruptcy Class, the Unsecured Creditors’ Committee and the Debtor, appointed an informal committee, (the “Evaluating Committee”), to settle with those former registered representatives who wanted to contribute to a fund (the “Participants”). The fund would then seek to pay the Debtor’s former customers (the “Investors”) who were eligible for distributions. To determine an individual Participant’s (“Broker”) contribution, the Evaluating Committee reviewed various documents that encompassed pending actions, arbitrations, litigations and/or complaints, including those filed with the SEC and NASD, against a Broker. The Evaluating Committee also considered a Broker’s ability to pay, the income derived by the Broker during his/her association with the Debtor, and financial information from those Participants who claimed an inability to pay. A Broker’s contribution consisted of either 50% of all pending claims against him/ her or at least $5,000 if he or she did not have any pending claims.
 

 As a result of the Evaluating Committee’s efforts, a fund (the “Settlement Fund”) of $1.64 million was negotiated with 151 Participants and Brown for distribution among the Bankruptcy Class. Brown contributed $300,-000 while the Participants contributed $1.34 million. Due to Brown’s limited resources, the Evaluating Committee accepted his contribution to settle all claims with the NASD, SEC and the Bankruptcy Class. In addition, Brown agreed to provide substantive testimony in any future New Jersey Class Action Litigation,
 
 [3]
 
 against those former representatives, who did not contribute to the settlement (“Non-Participants”).
 

 The five (5) essential features to the Initial Proposed Settlement (the “IPS”) are as follows: (1) distribution of approximately $1.6 million, less expenses and attorney fees, to
 
 *45
 
 eligible members of the Bankruptcy Class; (2) settlement and release of all present and future claims, arising from or relating to the purchase or resale of securities by or through the Debtor, against Brown, the Debtor, and the Participants who contributed to the settlement fund in amounts approved by the Bankruptcy Court; (3) Brown’s and the Debtor’s dismissal from future New Jersey actions; (4) release of any claims the Participants and Brown may have against the Debtor, including claims for contributions and indemnification; and finally, (5) distribution of the Debtor’s remaining assets, less expenses and fees, to eligible members of the Bankruptcy Class and to holders of unsecured claims other than securities claims.
 

 These releases applied whether such claims were commenced against the Debtor and/or one or more of the Participants, or have yet to be asserted in arbitration, litigation or other proceedings. The IPS does not provide releases or injunctions barring present or future claims for the Non-Participants.
 

 Representatives of the Bankruptcy Class mailed notice of the IPS to approximately 160,000 Investors, but only 44,000 responses were returned. This Court did not approve the IPS because the Settlement Fund was deemed inadequate.
 

 Revised Proposed Settlement
 

 The Evaluation Committee revised the IPS, herein referred to as the Revised Proposed Settlement (the “RPS”), by increasing contributions from the Participants while the terms of the releases remained the same. Although contributions increased from $1.34 million to $2 million, the total number of Participants dropped from 151 to 110.
 
 [4]
 
 The releases and injunctions barring present and future claims, which were part of the IPS, are now applicable only to Brown, the Debt- or, and the 110 remaining Participants (collectively the “Defendants”).
 

 Of the 160,000 notices mailed, only nine (9) separate customer objections, 11 in total, were filed with the Court. Generally, these objections were unpersuasive. One was not an objection but rather a request to opt-out. The Office of the United States Trustee (the “U .S. Trustee”), several members of the Bankruptcy Class, and the SEC — who is not a party to this action, — focused on the sufficiency of financial information provided to this Court. Other objections contended that the Participants made inadequate contributions in light of their alleged fraudulent activities. Finally, some objections expressed concern that they would not recoup their entire invested amount.
 

 On March 14 and April 8, 1997, this Court held hearings regarding the fairness of the RPS. The RPS received overwhelming support from attorneys for the Bankruptcy Class, the Debtor, and the Official Committee of Unsecured Creditors.
 

 Given the nature of the aforementioned objections, the sole issues before this Court are: (1) Whether it is equitable for Brown to receive a global release for his $300,000 contribution and his future testimonies? (2) Whether it is equitable for some members of the Bankruptcy Class to retain their rights to sue the Non-Participants and recover additional damages? (3) Whether it is equitable for some Participants to receive a release although they have not submitted sufficient financial information for the Court and the Investors to more accurately determine their ability to pay future damage claims? (4) Whether any viable alternatives to the Revised Proposed Settlement exist?
 

 DISCUSSION
 

 The standards to be applied in determining whether to approve a proposed settlement are well established in this Circuit. The central question is whether the compromise or settlement is fair, reasonable and adequately based on the facts and circumstances before this Court. Bankruptcy Rules 9019(a) and 7023.
 
 See also, In re Drexel Burnham Lambert Group,
 
 960 F.2d 285, 292-93 (2d Cir.1992),
 
 cert. dismissed
 
 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993) (stating that the obligation of the bankruptcy court is to determine whether a settlement is in the best interest of the estate
 
 *46
 
 before it). This inquiry requires this Court to engage in a two-step analysis. First, it must consider “the substantive terms of the settlement” and compare them to “the likely rewards of litigation.”
 
 Weinberger v. Kendrick,
 
 698 F.2d 61, 73 (2d Cir .1982),
 
 cert. denied,
 
 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983) (quoting
 
 Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson,
 
 390 U.S. 414, 424-425, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1 (1968)). Second, the Court must examine the process by which the settlement was reached to ensure that it was the product of arm’s-length negotiation rather than collusion, and that all interests have been effectively represented.
 
 Weinberger,
 
 698 F.2d at 73-74. As long as the integrity of the negotiation process is preserved, a strong initial presumption of fairness attaches to the proposed settlement, and the recommendation of counsels are accorded great weight.
 
 In re Painewebber Limited Partnerships Litigation,
 
 171 F.R.D. 104, 125 (S.D.N.Y.1997).
 

 The decision to grant or deny a settlement or compromise lies squarely within the discretion of the bankruptcy court.
 
 Nellis v. Shugrue,
 
 165 B.R. 115, 121 (S.D.N.Y.1994). This discretion should be exercised in light of the general public policy favoring settlements.
 
 In re Michael Milken &
 
 Assoc.
 
 Secs. Litig.,
 
 150 F.R.D. 46, 53 (S.D.N.Y.1993) (noting the paramount public policy for settlements). However, the court is not required to decide the numerous questions of law and fact before it.
 
 Protective Comm. For Indep. Stockholders,
 
 390 U.S. at 442, 88 S.Ct. at 1172. Rather, the court should canvass the issues to determine whether a settlement falls above the lowest point in the range of reasonableness.
 
 Id.
 

 Substantive Fairness
 

 In reaching an ultimate decision on fairness, bankruptcy courts in this Circuit have considered the following factors: (1) the complexity, expenses and likely duration of litigation; (2) the balance between the likelihood of success compared to the present and future benefits offered by the litigation; (3) the risk of establishing liability and damages; (4) the relative benefits achieved through settlement; (5) the proportion of the Bankruptcy Class that supports the settlement; and (6) the range of reasonableness of the settlement fund in light of all the attendant risks of litigation.
 
 Nellis,
 
 at 122.
 

 The complexity, expenses and likely duration of litigations against the Defendants place a tremendous burden on all the parties’ resources. The legal and factual issues presented in the existing and potential claims against the Defendants are complex, and would require substantial expenditures of both private and public funds if litigated. Since the Filing Date, litigations of these claims have consumed large sums of money and countless hours of labor. Absent a settlement, these costs are likely to continue escalating given the nature of discovery proceedings, motion and trial practices, and likely appeals. This would strain the judicial system and carry no guarantee of success for the plaintiffs. Moreover, these protracted litigations would continue to diminish the sum available for recovery.
 

 Furthermore, the risks of establishing liability and damages at trial must be weighed to determine the fairness of the RPS.
 
 See In re Painewebber Limited,
 
 171 F.R.D. at 126 (stating that the purpose of settlement is to avoid the inherent risks involved in litigation). Investors would face serious obstacles in establishing the elements of their fraudulent claims against the Defendants; namely “falsity, materiality, scienter and reliance.”
 
 Id.
 
 In addition, the alleged fraudulent activities would be subject to numerous defenses. Even if liability is established, the Investors will face the problems inherent in showing damages or proving loss in securities violation eases. Assuming they are successful, however, an Investor may not be able to collect these damages since the Defendants may still file bankruptcy separately. Weighing these factors, the RPS provides an opportunity for most Investors to benefit by recouping a percentage of their investment while eliminating the risks and escalating costs of litigation.
 

 Additionally, the favorable reception of the RPS by the majority of the Bankruptcy Class is further evidence of its fairness.
 
 *47
 
 Class members were informed of the material terms of the IPS and RPS and apprized of the deadline for filing objections in addition to the date and purpose of the fairness hearings. In response to the 160,000 notices that were mailed, only 9 class members filed objections. Since less than 1% of the Bankruptcy Class objects to the RPS, this is an extremely favorable response, in light the large size of the class.
 

 The benefits achieved by the RPS are sufficient to support a finding of fairness. The Bankruptcy Class will recoup approximately 30% of their exposure to the Debtor’s fraudulent activities since it will share approximately $2.3 million less expenses and fees. The fact that the class will redeem only a portion of potential recovery does not in of itself makes the RPS unfair or inadequate.
 
 Weinberger v. Kendrick,
 
 698 F.2d 61, 65 (2d Cir.1982) (affirming approval of a settlement even though a $2.84 million recovery was only a negligible percentage of the $250 million to one billion losses suffered by the class). In addition, class members will retain the right to pursue those Non-Participants who defrauded them for additional recoveries. That some Investors retain a right to sue for additional recovery is a meaningless distinction, which does not affect the fairness and adequacy of the RPS.
 
 See In re Milken,
 
 150 F.R.D. at 67.
 

 In determining substantive fairness, the court must assure that a settlement falls above a range of reasonableness by examining the terms of the settlement.
 
 Id.
 
 at 57. The SEC asserts that Brown has the financial ability to pay more. Although this Court appreciates the merit of the SEC’s contention, nevertheless it is unpersuasive. Since the Filing Date, Brown has earned a reduced salary. Even though his disclosed financial statement reveals assets of 340,000 for pending claims, Brown’s assets are approximately $ 463,924. Under the Debtor’s plan of reorganization, the Evaluation Committee agreed to accept his contribution to settle claims with SEC, NASD, and the Bankruptcy Class in exchange for Brown’s testimony against the Non-Participants in any future New Jersey actions. (Siegel Test., Tr pp. 27, 84-86, 88-89; Vihon Test., Tr pp. 174-78). It is common in this Circuit for a defendant in both a class action and regulatory proceedings to receive a global release in return for one contribution. Thus, given Brown’s financial difficulties, a global release in exchange for his contribution supports a finding of reasonableness.
 

 Some objectors contend that the RPS is unfair and inequitable since some of the Debtor’s former customers will retain the right to pursue claims against the Non-Participants. This Court disagrees. The Second Circuit has approved settlements where the class members received different percentages of recovery to take into account different factors so long as the settlement terms are rationally based on legitimate consideration.
 
 See In re Drexel Burnham Lambert Group, Inc.,
 
 130 B.R. 910, 918-919,
 
 aff'd,
 
 960 F.2d 285 (2d Cir.1992). The terms of the RPS are based on legitimate considerations since the Evaluation Committee considered the Participants ability to pay, the income the Participants derived, and pending, as well as potential, claims against them. This Court certified a non-opt class consisting of all Investors for the purpose of facilitating settlement with the Participants who were willing to contribute to a settlement fund. The fact that the Non-Participants refused, or could not afford, to contribute and therefore are not released, is an unavoidable consequence of the settlement process. This, however, does not render the RPS unfair, unreasonable or inadequate.
 

 Furthermore, that certain Participants did not submit financial information from which an individual Investor could determine whether that participant had the ability to pay more does not render the RPS unfair, unreasonable or inadequate. The Evaluating Committee requested a contribution of approximately 50% of all pending claims against a Broker. It also requested contributions of at least $5,000
 
 from
 
 those Brokers who did not have pending claims against them. Since ability to pay was not a consideration for those Brokers who contributed the requested amount in a reasonable and fair matter, this Court does not require financial statements from these Brokers to determine their ability to pay more.
 

 
 *48
 
 In addition, some objectors favor allowing Investors the right to pursue their individual claims against the Defendants. This, however, is not a viable alternative to the RPS. If Investors were to litigate their individual cases, there are no guarantees that they would succeed on the merits. Even assuming that some Investors prevailed, the prospect of collecting this judgment is ambiguous. Brokers may declare personal bankruptcy, which would impede collection of any such judgment.
 

 Alternatively, requiring the Participants to contribute larger sums is also not a viable alternative. Forty-one (41) Brokers dropped out of the IPS due to their financial difficulties, and some of these Brokers have declared bankruptcy. If the RPS is not approved and Participants are asked for larger contributions, a number of these Brokers may also drop out due to their inability to pay more. The remaining Participants may not be able to offset these losses. Thus, revising the RPS will only prolong this matter, thereby increasing administrative cost. In light of these factors, the RPS is the best alternative and therefore is fair, reasonable and adequate.
 

 PROCEDURAL FAIRNESS
 

 The second fundamental indicator of a settlement’s fairness is the requirement that the settlement was properly negotiated at arm’s-length by the parties.
 
 In re Painewebber Limited Partnerships Litigation,
 
 171 F.R.D. 104, 125 (S.D.N.Y.1997). The RPS is the product of arm’s-length negotiations among the Bankruptcy Class, the Creditor’s Committee, the Debtor, the Participants, and others. Since the integrity of the negotiation process was not impaired, and all the parties’ interests have been effectively represented, the RPS is approved as fair, reasonable and adequate.
 

 The considerations above warrant the approval of the RPS. In addition, the parties’ lawyers are experienced and knowledgeable in bankruptcy litigation and securities litigation. The Evaluating Committee has thoroughly investigated Investors’ claims. Accordingly, the RPS is within the range of reasonableness in light of the attendant risks of litigation.
 

 CONCLUSION
 

 Consistent with the above stated reasoning, this Court concludes that the RPS is fair, reasonable and adequate, and in the best interest of the Bankruptcy Class. Accordingly, all objections are overruled, and the Revised Proposed Settlement is APPROVED. Debtor is hereby instructed to settle an order consistent with this opinion on five (5) days notice.
 

 [1]
 

 .The New Jersey Class, in which the Debtor, its president, Richard Brown, and other individuals are defendants, was certified pursuant to Fed. R.Civ.P. 23(b)(3) by the United States District Court for the District of New Jersey
 
 In re Hibbard Brown & Company Securities Litigation,
 
 MDL Docket No. 962, Master File No. 93 CV 1150(AET).
 

 [2]
 

 . Because it appears that the examiner has substantially completed his duties and the purpose for which the examiner was initially appointed is no longer necessary.
 

 [3]
 

 . This is pursuant to a letter from the New Jersey class' Counsel, dated December 11, 1996, which was received by this Court on November 17, 1997.
 

 [4]
 

 . The 41 Participants who dropped out could not afford to contribute more than $3,000 to the Settlement Fund. As a result, some of these Participants have declared personal bankruptcy.