In re 1515 BROADWAY ASSOCIATES,
L.P., Debtor.

NEW YORK CITY DEPARTMENT OF
FINANCE, and New York State Depart-
ment of Taxation and Finance, Appel-
lants,

v.

1515 BROADWAY ASSOCIATES, L.P.
and the Equitable Life Assurance Soci-
ety of the United States, Appellees.

No. 92 Civ. 1023 (RWS).

United States District Court,
S.D. New York.

April 13, 1993.

O. Peter Sherwood, Corp. Counsel of the City of New York, New York City, for New York City Department of Finance; Helene R. Jaffa, Rita D. Dumain, Asst. Corp. Counsel, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for New York State Dept. of Taxation and Finance; David S. Cook, Sr. Atty., of counsel.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for appellees; Herbert S. Edelman, of counsel.

## OPINION

SWEET, District Judge.

1515 Broadway Associates, L.P. ("1515 Broadway" or "the debtor") and the Equitable Life Assurance Society ("Equitable") (collectively "the appellees") have moved to dismiss the appeals taken by the New York City Department of Finance ("the City") and the New York State Department of Taxation and Finance ("the State") (collectively, "the appellants") from an order confirming 1515 Broadway's plan of Reorganization, dated December 13, 1991, on the grounds that the appeal is moot since the debtor's plan of reorganization is consummated and the Court cannot effectively fashion a remedy. For the reasons given below, the motion to dismiss is denied in part and granted in part.

### Prior Proceedings

1515 Broadway is a Delaware limited partnership, initially organized in June 1984, to buy and operate a 53–story commercial office building known as One Astor Plaza and located at 1515 Broadway in New York City ("the Building"). In 1984, Manufacturers Hanover Trust Company ("MHT") provided interim financing and put together a consortium of banks to purchase the Building in a deal which included a groundlease, with an option to buy, of the land on which the Building sits. MHT and the Banks supplied 1515 Broadway with a nonrecourse mortgage loan ("the Mortgage Loan"), secured by a first mortgage on the Building, and a line loan ("the Line Loan") to fund cash shortfalls. MHT had the right to fund the Line Loan in order to

make payments on behalf of 1515 Broadway, including payments due under the Mortgage Loan, up the Line Loan's credit limit of $200 million. 1515 Broadway and MHT also entered into an interest rate exchange agreement in order to keep the effective interest rate under the Mortgage Loan below 13.69%. Both loans specified bankruptcy as an event of default which would accelerate all principal and interest payable under both loans.

Equitable guaranteed MHT's investment by providing 1515 Broadway with a stand-by loan commitment under which Equitable agreed to repay MHT the outstanding principal and balance of the Line Loan, and assigned this stand-by loan commitment to MHT as security for repayment of the Line Loan. Equitable's stand-by commitment extended only to amounts due under the Line Loan.

An additional $77 million for equity investment was recruited in March, 1985, when Bear Stearns & Co. marketed and sold approximately 25 limited partnerships interests in 1515 Broadway. The offering materials for these interests included financial projections which indicated that by 1990 the cash flow from the Building would be sufficient to service its substantial debt and generate a profit for the investors.

As the appellees' papers candidly put it, Bear Stearns' "projections proved to be too optimistic." 1515 Broadway was still 30% unoccupied in the fall of 1990, and additional unanticipated expenses (including an expensive asbestos abatement program) made it clear to the appellees that by 1992 the entire $420 million available under both the Mortgage Loan and the Line Loan would be exhausted. At this point, 1515 Broadway owed MHT $284 million in principal and $16.6 in interest under the Mortgage Loan, and $29.5 in principal and $366,000 in interest under the Line Loan.

On October 12, 1990, 1515 Broadway's general partner, Tishman Speyer Astor L.P. ("Tishman"), assigned both its general partner interest and a limited partnership interest to two affiliates of Equitable. On October 15, 1990, Equitable caused 1515

Broadway to file a petition for reorganization under Chapter 11 of the Bankruptcy Code. The Line Loan was terminated by the filing pursuant to the Line Loan Agreement, which prevented MHT from lending to 1515 Broadway any of the $90 million not yet advanced under the Line Loan.

Realizing it now had at least $90 million of its debt from 1515 Broadway owed under a nonrecourse Mortgage Loan by an insolvent building instead of under a Line Loan whose repayment was fully secured by Equitable, a solvent company, MHT promptly sued Equitable and 1515 Broadway and moved to dismiss the bankruptcy proceeding. Individual limited partners also sued Equitable and 1515 Broadway, alleging fraud and negligent misrepresentation in connection with the offering of the limited partnership interests.

The parties reached an agreement in principle by March 15, 1991, and negotiations led to the development of a Plan of Reorganization ("the Plan"), dated November 7, 1991. The Plan settled all outstanding lawsuits and required Equitable to supply 1515 Broadway with up to $133.5 million pursuant to the Equitable Facility agreement. Equitable also agreed to the transfer of some $100 million to MHT to settle the litigation over the Line Loan. The Limited Partners, the only other impaired class of creditors, were given the option of either retaining their interest in exchange for a release of their claims against Equitable and the debtor, or else forfeiting their interests and continuing their litigation. Virtually all of the Limited Partners accepted the settlement. The limited partnership structure of the Debtor was also reorganized, principally by creating another layer of limited partnership between Equitable and the debtor.[1] The Plan provided for the sale or foreclosure of the Building in 1995 or 1996 if the additional funding by Equitable proved to be inadequate.

The City filed an objection, asserting both that the reorganization of a former general partner as a new limited partnership and that the Plan's provision for possible liquidation of the debtor in 1995 or 1996 were transfers subject to the City's Real Property Transfer Tax (NYC Admin.Code § 11–2101). The Honorable Burton Lifland confirmed the plan over these objections by order dated December 13, 1991. After the Second Circuit held that the New York Gains Tax (imposed by Governor Mario Cuomo in 1983, *see* N.Y. Tax Law § 1441 (McKinney 1993)) is not similar to a stamp tax in *In re 995 Fifth Ave. Associates, L.P.,* 963 F.2d 503 (2d Cir.1992), the State also objected to the Plan on the ground that the exercise of the option to buy the land under the groundlease for $14 million as part of the Plan may be subject to the Gains Tax.

The City's and the State's appeals were docketed on February 10, 1992, and the motion to dismiss was filed on May 4th, 1992. By consent of the parties, argument on the motion was heard on January 20, 1993.

### *Discussion*

When Congress overhauled the bankruptcy laws in 1978, it extended the reach of the old Bankruptcy Act's debtor's exemption from stamp taxes to "similar taxes" in 11 U.S.C. § 1146(c):

> The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax.

The City alleges that the reorganization of 1515 Broadway's general partner as a limited partnership consists of a transfer between non-debtors which cannot, by definition, be covered by the Bankruptcy Code. The City also argues that the provisions of the Plan which provide for the sale or

---

1. The old structure of the 1515 Broadway Limited Partnership consisted of a general partner, Astor Plaza Venture ("AVP") and the investors as limited partners. AVP was a general partnership, 50% owned by Equitable and a limited partnership subsidiary, Astor Plaza Venture,

L.P. ("APVLR"). Under the Plan, AVP was reorganized as a limited partnership, and Equitable now owns its 50% as a limited partner. The limited partner investors who accepted the plan were issued new limited partnership interests.

foreclosure of the Building in 1995 or 1996 are future transfers which cannot be exempt from the tax.

The State alleges that Gains tax might be due, "because returns were not filed during the consummation of the Plan, the State is uncertain as to what precise tax liabilities are at stake, and is unable to address them here more specifically," (State Mem. of Law in Opp., at 5). It is sufficient in this context to note that Equitable and 1515 Broadway have admitted that transferring assets under bankruptcy protection saved some $20 to 25 million in potential tax liability (Appellees' Mem. to Dismiss at 23).

The appellees argue that the central issue is whether or not the appeal is moot because of procedural default and because 1515 Broadway's reorganization under the Plan has been substantially completed, and that (in the absence of a stay of the Confirmation Order) any modification of the Plan approved by the Bankruptcy Court is at this point an impermissible modification of a consummated plan of reorganization in violation of Section 1127(b) of the Bankruptcy Code. The appellants concede that the reorganization is complete, but maintain their appeals are not moot because only the solvent limited partner Equitable owes the taxes, and Equitable's payment of these taxes cannot affect the reorganization of 1515 Broadway.

### Mootness

The appellees first move to dismiss on the ground that the appellants did not seek the required stay order from Chief Judge Lifland pursuant to Bankruptcy Rule 8005, which reads:

A motion for a stay of the judgment, order, or decree of a bankruptcy court ... or for other relief pending appeal must ordinarily be presented to the bankruptcy judge in the first instance.... A motion for such relief, or for modification or termination of relief granted by a bankruptcy judge, may be made to the district court or the bankruptcy appellate panel, but the motion shall show why the relief, modification, or termination was not obtained from the bankruptcy judge.

Fed.R.Bankr.P., Rule 8005 (West Supp. 1993). Since the City and the State neither sought nor obtained a stay, the appellees seek to have the claim dismissed as moot.

■ When a stay of an order confirming a reorganization plan pending appeal has not been obtained and the plan has been consummated, the appeal may be dismissed as moot for three reasons. *In re Revere Copper and Brass Incorp.*, 78 B.R. 17, 20–21 (S.D.N.Y.1987) (inequitable to hear creditors' appeal from confirmation of plan; appeal dismissed as moot). The first is grounded in federal jurisdiction: completing the reorganization of the debtor ends the "actual controversy" which precipitated the bankruptcy proceeding. The second is practical, and strongly related to the third: where "substantial elements of the reorganization plan have been implemented in the absence of a stay, any appeal of the confirmation order is moot because it is very doubtful that effective relief could be afforded...." *Id.* at 21. The third and final reason is that the mootness doctrine promotes an important policy of bankruptcy law: that court-approved reorganizations go forward in reliance upon such approval unless a stay has been obtained.

■ A failure to secure a stay however, will not automatically make the party's claims moot:

We agree with the district judge that, to the extent reversal of the confirmation order would require the invalidation of good faith transfers, appellants' unsuccessful effort to obtain a stay was fatal. It is equally evident, however, that failure to secure a stay is not *per se* dispositive of *all* the issues before us.... Where a stay has not been secured, alleged claims of mootness on issues not directly controlled by the Bankruptcy Rules are subject to the principles first enunciated in *Mills v. Green. ...*

*In re AOV Indus., Inc.*, 792 F.2d 1140, 1146 (D.C.Cir.1986). *See also In re Texaco Inc.*, 92 B.R. 38, 44 (S.D.N.Y.1988) ("There is no general requirement, nor has there

ever been, that one must obtain a stay as a precondition for appeal.")

■ However, if there is no longer a case or controversy, a court will no longer have jurisdiction over the conflict under Article III. The purpose of a stay pursuant to an appeal is to preserve the existence of a case, for a stay necessarily puts the other parties on notice that they either should not go ahead with the plan or at least should not regard disbursements as final. Good faith transfers must be immunized from reversal if the parties have no notice that such transfers may be affected by the reversal or modification of the bankruptcy's court order. Otherwise, without a stay, a plan of reorganization may be consummated and the status of the parties altered to the point where there is no longer a case or controversy over which the court may exercise its jurisdiction. As the Supreme Court stated in *Mills:*

> [W]hen, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for this court, if it should decide the case in favor of the plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal.

*Mills v. Green,* 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895). *See also Hall v. Beals,* 396 U.S. 45, 48, 90 S.Ct. 200, 201, 24 L.Ed.2d 214 (1969) (mootness "avoid[s] advisory opinions on abstract propositions of law.")

■ Mootness concerns more than a court's raw power under Article III jurisdiction:

> The cousin of the mootness doctrine, in its strict Article III sense, is a melange of doctrines relating to the court's discretion in matters of remedy and judicial administration.... Unlike Article III mootness, these doctrines address not

the power to grant relief but the court's discretion in the exercise of that power. *Chamber of Comm. v. U.S. Dept. of Energy,* 627 F.2d 289, 291 (D.C.Cir.1980). In the bankruptcy context, these equitable principles retain an important role, and the case may be moot in situations where the court has jurisdiction under Article III but reversing on appeal would destroy the work of the bankruptcy court. "[I]t may be incumbent upon a party appealing a bankruptcy court's ruling to seek a stay lest the appeal in question be rendered moot by constitutional or related equitable/jurisprudential considerations." *In re Texaco,* 92 B.R. at 45; *see also In re Information Dialogues,* 662 F.2d 475, 477 (8th Cir.1981).

■ Equitable and 1515 Broadway correctly point out that the usual benchmark for determining when an appeal in bankruptcy is moot is whether the plan in question has been "substantially consummated," a technical term defined in Section 1101(2) of the Bankruptcy Code.[2] The appellants are careful to hedge their argument, however, in effect admitting that the "substantial consummation" of a plan of reorganization is not, as the State puts it, "the talisman that Equitable argues it is." As the State correctly points out, a "court cannot avoid its obligation to scrutinize each individual claim, testing the feasibility of granting the relief against its potential impact on the reorganization scheme as a whole," *In re AOV Indus., Inc.,* 792 F.2d at 1148.

■ Referring to the "unusual circumstances" of the particular situation, the court in *AOV* held that where all of the parties which could be affected by the claims were before the court, and where the court's resolution would "not affect the reemergence of the debtor as a revitalized corporate entity," (*id.* at 1149), an appeal need not be dismissed as moot despite a failure to secure a stay of the bankruptcy judge's confirmation order. Under such

---

**2.** The definition in 11 U.S.C. § 1101(2) is the: (A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan.

circumstances, the reasons for dismissing an appeal as moot will not apply since the district court may still effect a remedy without unduly interfering with the plan of reorganization.

In *AOV*, one appellant refused to release the debtor from his claims but sought to obtain his share of a $3 million fund set aside for creditors who tendered certain releases in favor of the debtor, claiming that he deserved an exemption from the release requirement. Another appellant alleged a conflict of interest on the part of one of the law firms structuring the bankruptcy plan, since the law firm had been previously retained by a major creditor and its legal fees were being paid by that creditor to the extent these were not paid by the debtor. The court reached and denied the creditor's claim on the merits after determining that, since the funds for paying the creditor and had not been disbursed, the money was still available and therefore the circuit court still had effective authority over the appeal. *Id.* at 1149. Since the question of the legal fees was being separately argued, the court did not reach the merits of that issue but noted that, since all parties were on notice of the possible change in the fee arrangements, such notice kept the issue from being moot. *Id.* This is nothing more than a restatement of the original rationale for requiring parties which object to a plan of reorganization to file a stay in the first place.

In the process of deciding that it could reach the issues on appeal, the court in *AOV* essentially defines mootness as a matter of money: if the claims have not yet been paid because the money is still under the control of the bankruptcy court and the trustee or debtor in possession, a court on appeal may still effectively fashion relief. Although the court in *AOV* admitted that the plan had been substantially consummated, it followed *In re Combined Metals Reduction Co.*, 557 F.2d 179 (9th Cir.1977) (since plan still controlled future actions of trustee, appeal from order of confirmation was not moot), and stated that "implementation is not always synonymous with consummation." *AOV*, 792 F.2d at 114. It then found that the plan of reorganization in *AOV* had not been fully implemented since only $643,000 of the $3 million available for the creditors' fund through a letter of credit had been drawn down, and since by its terms the letter of credit was to be available for three years after the date of consummation, the money in these funds was available and redirecting it would not necessarily upset the plan as a whole.

The court contrasted the availability of the funds in these circumstances to the true irreversibility of good faith transfers in the absence of a stay, an irreversibility formerly required by rule and still retained by the Advisory Committee Note to Rule 8005:

> [T]he practicalities of bankruptcy proceedings require such a rule.... [P]ayments to priority creditors had been made; cash settlements with banks and agency creditors had been completed; and large blocks of stock had been sold to independent third parties.... Because these transactions are immunized from reversal.... [w]e agree with the district judge that, to the extent reversal of the confirmation order would require the invalidation of good faith transfers, appellants' unsuccessful effort to obtain a stay was fatal.

*AOV*, 792 F.2d at 1147.

■ The determinative factor is whether the funds are still available to the court, either because they have not yet been disbursed or because the party to which they have been paid has been on notice, through a stay or otherwise, that the funds are being contested. *Cf. In re Roberts Farms*, 652 F.2d 793 (9th Cir.1981) (appeal not moot since recipient of fees always knew that another creditor was contesting bankruptcy court's order granting fees). Limiting a court's jurisdiction over appeals in this way respects the "creditor's bargain" at the heart of bankruptcy law. *See, e.g.,* Thomas H. Jackson & Robert E. Scott, *An Essay on Bankruptcy Sharing and the Creditors' Bargain*, 75 Va.L.Rev. 155 (1989) (arguing bankruptcy law represents a hypothetical *ex ante* bargain between creditors imposed to maximize debtors' net assets in the event of disaster).

■ Bankruptcy courts in the Second Circuit have followed *AOV:*

> The appeal [in *AOV*] ... was extremely circumscribed in scope. Accordingly, the holding in *AOV* is merely that an appeal will not be dismissed as moot, in the absence of a stay, only where there will be no harmful or prejudicial effect on creditors not party to the appeal and where there will be no impact on the activities of the debtor in its reorganized form.

*Revere Copper,* 78 B.R. at 22. The case cannot be dismissed as moot under Article III without examining whether the claims are moot under the *AOV* exception for harmful effects on other creditors and impact on the reorganized debtor, a fact-specific inquiry unique to each case. *In re Texaco,* 92 B.R. at 47.

### The Transfer from the General Partnership to a Limited Partnership

■ According to the City, the transformation of the general partnership AVP into a limited partnership is a transfer between non-debtors and therefore never properly within the jurisdiction of the Bankruptcy Court. Not only does this make the appeal viable, the City argues, this fundamental defect of jurisdiction means this Court need not even worry about whether the limited exception in *AOV* covers this instance.

■ Where the interests in the debtor are organized in layers of corporate structure, as they are here, a bankruptcy court must have jurisdiction over more than the most immediate layer if it is to succeed in readjusting the interests of the parties. *See AOV,* 792 F.2d at 1145. As the Disclosure Statement described the reorganization of the partnership, "this arrangement is to substantially eliminate the liability of [Equitable] for obligations of the Debtor, except as otherwise expressly provided." The other provisions of the Disclosure Statement set out Equitable's contributions to the debtor in the forms of new loans to 1515 Broadway and settlements with the other creditors.

Equitable and its limited partner subsidiaries are "nondebtors whose assets were not before the Bankruptcy Court," (City's Mem. in Opp. at 4), but this is only because they were creditors. The adjudication of the claims of one creditor vis-a-vis another as part of a debtor's proceeding in bankruptcy is well within the jurisdiction of the bankruptcy court. "Although the bankruptcy court's decision may have an impact on claims outside the scope of the immediate proceedings, we do not ... prohibit all bankruptcy court decisions that may have tangential effects," *AOV,* 792 F.2d at 1145 (holding bankruptcy court had jurisdiction over allegedly "'non-bankruptcy claims'— those held by one creditor against another creditor"). Equitable bargained for this reorganization as part of its consideration for supplying more capital to the debtor. The reorganization of the limited partnership is at the core of the reorganization plan, and forms a part of the parties' settlement that cannot be severed and altered now without effect on the other parts of the Plan. *In re Texaco,* 92 B.R. at 51; *Miami Center Ltd. Partnership v. Bank of New York,* 838 F.2d 1547, 1556 (11th Cir.1988). The issue of whether or the Court should upset the reorganization of the limited partnership is moot under the standards in *AOV, Revere,* and *Texaco.*

### *The Possible Foreclosure of the Property*

■ The City's other argument, however, has merit. The potential future foreclosure of a property is not moot under the *AOV* test for the simple reason that the transaction—and therefore the disbursement of the moneys which will become available from it—have yet to happen.

Under current projections, the Building should be solvent or close to it by 1995. If it is not, the parties intended to forestall future disagreements about the disposal of the debtor's assets through making arrangements to liquidate the assets, and some of the releases secured from certain parties included consents to liquidation under particular circumstances. Obviously, the parties are free to make these arrangements. Just as obviously, however, since this hypothetical liquidation is in the fu-

ture, the funds produced from any foreclosure sale may be still "available" and effective relief may still be possible. *Cf. In re 995 Fifth Avenue*, 963 F.2d at 506 (appeal not moot because debtor paid gains tax under protest in order to close sale, and therefore funds for tax had not been allotted to any other creditor). A possible future sale of the building may well stand independently and apart from a plan reorganizing that debtor as a continuing entity. *Cf. In re Roberts Farms, Inc.*, 652 F.2d 793, 797 (9th Cir.1981); *In re Texaco*, 92 B.R. at 50.

### *Taxes Imposed by New York State*

■ The State argues that its appeal is not moot because the appellees do not show precisely *"how* any transaction would have to be undone, or *who* among the creditors whose rights with respect to the debtor were adjusted by the Plan would be affected." (State's Mem. in Opp. at 8.) The State argues that its appeal would require only the filing of tax returns and other information documents with the appropriate officials, and to the extent that these documents would show any party to one of the transactions under the Plan other than the debtor was liable, the state would be able to collect the tax from that party.

The filing of tax returns is not such an imposition that it will significantly alter the relationship of creditors to one another. Collecting pre-petition taxes from which Judge Lifland ruled the debtor was exempt, however, might do so. Although post-petition taxes must be paid, *see Hollywell Corp. v. Smith*, — U.S. —, 112 S.Ct. 1021, 117 L.Ed.2d 196 (1992) (trustee in bankruptcy must file income tax returns and pay taxes on income received by bankrupt's estate), transfers of property in bankruptcy are exempt from stamp taxes and similar taxes under 11 U.S.C. § 1146(c). A plan of reorganization does not need to name the transfers which are exempt, for the "statute does not required that the reorganization plan include specifics.... Congress's apparent purpose in enacting section 1146 was to facilitate reorganization through giving tax relief, a purpose served equally well when the reorganiza-

tion plan leaves details to be settled in the future." *In re Jacoby–Bender, Inc.*, 758 F.2d 840, 841 (2d Cir.1985). Filing of tax returns by the debtor does not automatically make previously untaxable transfers taxable.

Section 1146(c), however, only exempts "stamp or similar" taxes. When the Order of Confirmation was entered in December, 1991, the law in New York was that the exemption in 11 U.S.C. § 1146(c) was applicable to the Gains Tax as a transfer tax similar enough to a stamp tax to come under the provision in the Bankruptcy code. That was changed by the Second Circuit on *In re 995 Fifth Avenue*, 963 F.2d 503 (2d Cir.1992), which held that because the Gains Tax was assessed on capital gains realized in the course of a transfer, and not merely on the fact of transfer, it could not be covered by the tax exemption. Since part of the debtor's plan of reorganization involves the purchase of previously-leased land beneath the building, the State argues that it does not know whether or not certain parties owe Gains Tax on this or other transfers unless the State is given the opportunity to review tax returns of the Debtor.

Without deciding the merits of these issues on this motion to dismiss, it is enough here to note that an issue which could not have been considered by the bankruptcy court cannot be moot. The application of the Second Circuit's decision in *re 995 Fifth Avenue* to this case, and the question of whether any gains tax is due under the particular circumstances of this transfer, are questions which are not moot.

### *Conclusion*

For the reasons given above, Equitable's and 1515 Broadway's motions to dismiss the appeals of the City and State are denied, though the appeals will be limited as described.

It is so ordered.