**SIX WEST RETAIL ACQUISITION, INC. Appellant,**

v.

**In re LOEWS CINEPLEX ENTERTAINMENT CORP., et al., Appellees.**

**Nos. 02 Civ. 3703(RMB), 02 Civ. 3705(RMB).**

United States District Court, S.D. New York.

Nov. 13, 2002.

---

240

Mark Thomas Power, Hahn & Hessen, L.L.P., New York City, for Appellant.

Bonnie Steingart, Fried, Franka, Harris, Schriver, & Jacobson, New York City, for Appellees.

## DECISION AND ORDER

BERMAN, District Judge.

### I. Background

On or about May 15, 2002, Six West Retail Acquisition, Inc. ("Appellant" or "Six West") appealed, pursuant to 28 U.S.C. § 158(a) and Federal Rule of Bankruptcy Procedure ("Fed. R. Bankr.Pro.") 8001, from the March 1, 2002 Order of Confirmation of the Honorable Allan L. Gropper, United States Bankruptcy Judge, Southern District of New York ("Confirmation Order"), confirming the (First Amended) Chapter 11 Plan ("Plan") of Loews Cineplex Entertainment Corporation ("Appellee" or "LCE") and its subsidiaries (collectively, "Debtors").[1] Appellant, one of many unsecured creditors of the Debtors, seeks to overturn the Confirmation Order principally on the grounds that "(1) there is no evidence to support the confirmation of the Plan; and (2) the Bankruptcy Court and Debtors improperly refused to pursue, or even to evaluate, the highly suspicious prepetition transfer of some $417 million from the Debtors' estates to one of Debtors' primary shareholders—Sony Pictures Entertainment Corporation ('Sony')." Brief of Appellant dated June 7, 2002 ("Appellant's Brief") at 1. Appellant also challenges the Bankruptcy Court's determination that a deposition transcript Appellant sought to offer into evidence was inadmissable as hearsay. *Id.* at 24.

On June 24, 2002, the Debtors opposed the appeal(s), arguing, among other things, that: (1) "[t]he appeal is moot" because the Plan is substantially consummated; (2) the Bankruptcy Court did not abuse its discretion in concluding that certain settlements reflected in the Plan were reasonable; and (3) the Bankruptcy Court correctly excluded from consideration certain deposition testimony of a non-party. Brief of Appellees Loews Cineplex Entertainment Corporation, et al. ("Appellees' Brief") at 1–2. A reply brief was filed by Appellant on July 8, 2002 ("Appellant's Reply").[2]

Appellant is a real estate development company that, at one time, owned or leased three movie theatres managed by Debtors. Debtors' management of two of the theatres terminated prior to Debtors' filing for bankruptcy on February 15, 2001. Appellant's Brief at 4.

Debtors are movie theatre companies operated under the Loews Theatres and Cineplex Odeon Theatres names. Appellees' Brief at 3. During the late 1990's, Debtors experienced significant liquidity and cash flow deterioration. *See* ROA Doc. 1052, Appendix II at 23.[3] In an effort to alleviate its financial pressures, on May 14, 1998, Debtors closed on a restructuring transaction ("Pre–Petition Restructuring"). ROA Doc. 327 at ¶¶ 10–16.[4]

---

1. In fact, two appeals were filed by Six West relating, respectively, to: (i) confirmation of the Plan and a proposed settlement integral to the Plan between the debtors and the unsecured creditors (02 Civ. 3705); and relatedly, (ii) refusal by the Bankruptcy Court to appoint an independent examiner to investigate certain claims against shareholders of the debtors and members of the LCE board of directors (02 Civ. 3703).

2. Neither party has requested oral argument. In any case, the written submissions are sufficient.

3. Appellant's Designation of Items to be Included in the Record on Appeal is herein referred to as "ROA Doc." Appellees' Counter–Designations of Items to be Included in the Record on Appeal is herein referred to as "App. ROA Doc.".

4. As part of the Pre–Petition Restructuring, $417 million was paid to Sony, representing:

On February 14, 2001, the Debtors agreed to a letter of intent ("Letter of Intent") with Oaktree Capital Management, LLC and Onex Corporation (collectively, the "Investors"), to recapitalize and change control of Debtors under a proposed plan of reorganization. *Id.* at ¶¶ 18–20. And, on February 15, 2001, the Debtors filed with the Bankruptcy Court petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* Appellant's Brief at 3–4. On May 17, 2001, as part of the bankruptcy proceeding, the Official Committee of Unsecured Creditors of Loews Cineplex Entertainment Corporation, *et al.* ("Creditors' Committee") filed a motion ("Exclusivity Motion") with the Bankruptcy Court, objecting to certain terms of the Letter of Intent. ROA Doc. 327. The Creditors' Committee protested, among other things, that the Letter of Intent contemplated the release, allegedly without adequate consideration, of potential causes of action of the Debtors' estate, which included: (i) claims to recover some or all of $417 million received by Sony during the Pre-petition Restructuring, *id.* ¶¶ 1–4, 10–17; (ii) claims against LCE directors, shareholders, officers and agents "for breach of fiduciary duty by over-leveraging the company ... at the risk and expense of general unsecured creditors" ("Insider Claims"), *id.* ¶¶ 16, 21, and (iii)

claims with respect to the avoidance of certain liens and mortgages granted to creditors as part of the Pre–Petition Restructuring ("Bank Claims") (the Insider Claims and the Bank Claims are collectively referred to herein as "Causes of Action"). *Id.* ¶¶ 17, 22. In connection with the denial of the Exclusivity Motion by the Bankruptcy Court on June 12, 2001 and June 19, 2001, the Creditors' Committee, Debtors, pre-petition lenders and Investors engaged in negotiations to modify the terms of the Letter of Intent. A settlement and compromise ("Settlement") was reached among the parties on November 11, 2001 and was embodied in the proposed reorganization Plan filed January 14, 2002. ROA Doc. 1190 at 33; ROA Doc. 1052 at 33, 74.[5]

On January 16, 2002, the Bankruptcy Court approved the adequacy of the disclosure statement, dated January 14, 2002 ("Disclosure Statement"), which accompanied the proposed Plan of reorganization; fixed the date and time for filing objections to the Disclosure Statement; and set forth the voting procedures for approval. ROA Doc. 1056. "[T]he Plan was overwhelmingly accepted by the creditors in each class that voted." App. ROA Doc. 1052 at 27–28; ROA Doc. 1202 at 5 ("93.5632% in number of the Holders of [LCE General Unsecured Claims] ... that voted on the

---

(i) a cash payment to satisfy all intercompany indebtedness ($296 million); (ii) a cash payment equal to the value of certain transferred assets ($18 million); and (iii) the payment of a dividend to a Sony subsidiary ($103 million). ROA Doc. 1052, Appendix II at 26.

**5.** As part of the Settlement, the Investors agreed to commit up to $45 million (but no less than $25 million) in cash to create a fund for distribution to unsecured creditors, ROA Doc. 1052 at 74, and, in consideration for the $45 million and in settlement of $300 million in pre-petition claims held by the Investors, the Investors were to receive 100% of new common stock in the reorganized Debtors,

*id.;* Appellant's Brief at 10; Appellees' Brief at 5, and the Debtors were to retain all rights to enforce any and all Causes of Action of the estate, including those related to Sony. Appellees' Brief at 5.

The Settlement did not release any third-party claims against Sony or any other entity. *Id.* at 5. "In reaching this agreement, the Creditors' Committee determined that, among other things, a $45 million Cash distribution provided significantly greater value [to the unsecured creditors] than the value that would have been realized ... through pursuit of claims relating to the" Pre–Petition Restructuring. ROA Doc. 1052 at 33.

Plan, accepted the Plan," and "91.3846% in number of the Holders of [Subsidiary General Unsecured Claims] . . . that voted on the Plan, accepted the Plan.").

Six West filed objections to the proposed Plan on February 22, 2002, arguing, among other things, that the Debtors failed to demonstrate that the Settlement was fair and reasonable. ROA Doc. 1170 at 8–10. Six West also filed a motion with the Bankruptcy Court, on February 22, 2002, seeking the appointment of an examiner to investigate the potential value of the Insider Claims. ROA Docs. 1180. At the confirmation hearing held February 28, 2002, Six West's motion to appoint an independent examiner was denied, App. ROA Doc. 1261 at 220, as were its objections to confirmation of the Plan. As of February 28, 2002, no other objections to the Plan were still pending.[6] App. ROA Doc. 1261; ROA 1202 at 3.

On March 1, 2002, the Bankruptcy Court approved the Plan of Reorganization and issued the Confirmation Order in an extensive ruling from the bench, following the

conclusion of confirmation hearing testimony, oral argument, and briefing.[7] ROA Doc. 1202; App. ROA Doc. 1261 at 91.123, 216–31. The Confirmation Order stated that "based upon all pleadings and papers filed in these chapter 11 cases, the record at the hearing on the adequacy of the disclosure statement and all proceedings heretofore held," ROA Doc. 1202 at 3, all requirements of Section 1129 of the Bankruptcy Code had been met, *id.* at 5–9, and, "[t]he provisions of the Plan constitute a reasonable, good faith compromise and settlement of all Causes of Action or disputes that could have been brought by any Holder of a General Unsecured Claim, the Debtors or any other party in interest, against any Holder of a Pre–Petition Credit Agreement Claim." *Id.* at 10.[8] Six West did not seek a stay of the Confirmation Order. Appellees' Brief at 9.

The Plan became effective on March 21, 2002 ("Effective Date"). Since the Effective Date, as will be shown, numerous steps to implement the Plan have been consummated, including, among others: (i)

---

**6.** Merrill Lynch, a creditor of the Debtors, had filed a motion seeking the appointment of an examiner, on November 6, 2001, ROA Docs. 883, 913, and Six West filed a pleading, dated November 6, 2001, in support of that motion. ROA Doc. 907. Merrill Lynch's motion was withdrawn once an agreement was reached as to the terms of the proposed Plan and Six West did not pursue or renew its request for appointment of an independent examiner until February 22, 2002. ROA Doc. 1180; Appellees' Brief at 6.

**7.** The Bankruptcy Court heard testimony from: (i) Debtors' Chief Financial Officer and Treasurer, John J. Walker; (ii) James Elliot Millstein of Lazard & Freres, who was responsible for supervising a liquidation analysis of Debtors; and (iii) Six West's General Counsel Joshua Epstein. App. ROA Doc. 1261. The Court also heard oral argument from, among others, counsel for the Debtors, the Creditor's Committee, and the Investors, *id.*, and considered the Declaration of John J.

Walker in Confirmation of the Debtors' First Amended Chapter 11 Plan, ROA Doc. 1191, Six West's objections and motion to appoint an independent examiner, ROA Docs. 1170, 1180, a Memorandum of Law in Support of Debtors' First Amended Chapter 11 Plan, ROA Doc. 1190, and Debtors' response to Six West's objections and motion to appoint and independent examiner. ROA Doc. 1192.

**8.** The Order also acknowledged that the "Debtors (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code," ROA Doc. 1202 at 13, and that *"there is no evidence that* substantive consolidation of the Subsidiary Debtors for Plan purposes will . . . prejudice the rights of any creditors or equity security holders of the Debtors." *Id.* at 12 (emphasis in original).

the cancellation of LCE's publicly traded common stock; (ii) the issuance of new equity by the Debtors; (iii) the merger and dissolution of 118 Debtors; and (iv) the closing on a $140 million senior secured credit facility. *Id.* at 1. **For the reasons set forth below, the Court affirms the decision of the Bankruptcy Court.**

## II. Standard of Review

"On appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of witnesses." Fed. R. Bank. Pro. 8013; *see In re Blaise*, 219 B.R. 946, 950 (2d Cir. BAP 1998). "[A] bankruptcy judge's legal conclusions are reviewed *de novo.*" *In re Fischer*, 202 B.R. 341, 345 (E.D.N.Y.1996).

## III. Analysis

There is no basis in law or fact to disturb the decision of the Bankruptcy Court.

### A. The Appeal is Moot

■ The Court agrees with Appellees' contention that this appeal has "become moot because the Debtors' Plan is now substantially consummated," Appellees' Brief at 9, and, relatedly, because Appellant never sought a stay. *Id.* at 17. Counsel to the Debtor has submitted a sworn

affidavit, dated June 24, 2002, which describes more than ten (10) separate substantial transactions that have occurred following confirmation of the Plan, including, without limitation, the granting of liens on substantially all of the reorganized Debtors' assets, the cancellation of $300 million in pre-petition senior notes held by Investors, the termination of shareholder agreements, and the termination of Debtors' $60 million debtor-in-possession financing agreement. *See* Declaration of Gary L. Kaplan dated June 24, 2002 ("Declaration") at 2–3.[9] *See also In re Texaco Inc.*, 92 B.R. 38, 46 (S.D.N.Y.1988) (finding substantial consummation); *In re Best Products Co.*, 177 B.R. 791, 796–99 (S.D.N.Y.1995) (absent a stay, consummation had occurred).

"It is well settled that when a stay of an order confirming a reorganization plan pending appeal has not been obtained and the plan has been consummated, the appeal may be dismissed as moot." *In re Revere Copper and Brass Inc.*, 78 B.R. 17, 20 (S.D.N.Y.1987). "The source of this principal is Article III of the Constitution which states that federal courts only decide 'actual controversies.'" *Id.* at 21. Absent a stay, "the debtor and its creditors are free to execute on the judgment of a bankruptcy court," *Texaco*, 92 B.R. at 45, and "'[i]f an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the appeal must be dismissed' by virtue of the Article III's 'case or controversy' requirement.'" *In re Chateaugay Corp.*, 10 F.3d 944, 949–

9. The Court is not persuaded by Appellant's application to strike Mr. Kaplan's Declaration "as it does not even aver that it is based upon personal knowledge, and it is without foundation." Appellant's Reply at 2. Mr. Kaplan participated in the bankruptcy proceedings (including the confirmation hearing) and, as counsel to the Debtors, is familiar with the post-confirmation transactions. The Declaration is submitted under oath. *See Herrera-Bonilla v. Nelson*, 1988 WL 36984, at *5 (E.D.N.Y. Apr.14, 1988) ("[a]n attorney's affidavit is given considerable weight by the Court generally and the reliance placed on such affidavits is significant as the interest of justice demands it to be so").

950 (2d Cir.1993) (quoting *Church of Scientology v. United States*, 506 U.S. 9, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) (quotation omitted)). Since "it is inherently improbable, once there has been 'substantial consummation,' that an appellate court will be able to fashion effective relief," mootness is presumed. *Texaco*, 92 B.R. 38 at 45. "This presumption is undergirded by the common sense notion that the piecemeal dismantling of the Reorganization Plan in subsequent appeals of individual transactions is, in practical terms if nothing else, a virtually impossible task." *Id.* at 46 (internal quotations and citation omitted).

The Court has no doubt that the Confirmation Order and the Plan of Reorganization have been substantially consummated.[10] Appellees submit that since March 21, 2002, among other things: (i) Debtors' preexisting securities, including its publicly traded common stock and its $300 million of bonds, were canceled; (ii) 100,000 shares of new common stock were issued and distributed to the Investors; (iii) LCE's existing shareholder agreements were terminated; (iv) a new certificate of incorporation was filed for each Debtor; (v) all intercompany debt was canceled; (vi) certain allowed claims were paid in cash pursuant to the Plan; (vii) 118 of the Debtors were merged into other Debtors or dissolved; (viii) the $45 million Settlement was funded by the Investors; (ix) $429,409,000 in new secured debt was issued; (x) the debtor in possession financing facility was repaid and terminated and a $10 million postpetition financing facility was repaid and terminated; (xi) the reorganized Debtors entered into a $140 million credit facility with a syndicate of lenders that is currently funding the operations of the reorganized Debtors; and (xii) the reorganized Debtors granted liens on substantially all of its assets to secure the Exit Facility. Declaration at 2–3; Appellees' Brief at 11–12. This surely constitutes "substantial consummation." *See, e.g., Texaco*, 92 B.R. at 46; *Best Products*, 177 B.R. at 796–99.[11]

■ Substantial consummation raises the presumption that an appeal is moot. *See In re 1515 Broadway Assocs., L.P.*, 153 B.R. 400, 405 (S.D.N.Y.1993). This presumption may be overcome only if all of the following criteria are met: (1) the court can still provide effective relief; (2) granting relief will not affect the re-emergence of the debtor as a revitalized corporate entity; (3) granting relief will not unravel the transactions that formed the basis of the plan or reorganization; (4) the parties that might be adversely affected by a grant of relief have received notice and an opportunity to be heard; and (5) the entity seeking relief has diligently pursued a stay of execution of the plan throughout the proceeding. *In re Chateaugay Corp.*, 94 F.3d 772, 776 (2d Cir.1996). Here, Appellant fails to establish at least four of these criteria, as follows:

### Six West's Failure to Seek a Stay

Appellees argue persuasively that Appellant's failure to seek a stay (as well as

**10.** Substantial consummation is defined in 11 U.S.C. § 1101 as "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan."

**11.** It is not unreasonable to assume that there have been additional business transactions in the Debtors' "ordinary course of business ... [to] have transpired against the backdrop of the confirmed Plan." *Texaco*, 92 B.R. at 46. *See also Best Products*, 177 B.R. at 802.

its failure to take significant action with respect to the Causes of Action until six days prior to the confirmation hearing) "makes it inequitable to allow this appeal to proceed." Appellees' Brief at 17–18. "An appeal should ... be dismissed as moot when, even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." *In re Chateaugay Corp.,* 988 F.2d 322, 325 (2d Cir.1993). "Such a dismissal is appropriate when the appellant has made no effort to obtain a stay and has permitted such a comprehensive change of circumstances to occur as to render it inequitable for the appellate court to reach the merits of the appeal." *Id.* (internal quotations and citations omitted). As noted, multiple post-confirmation transactions have been consummated. *See In re Chateaugay Corp.,* 988 F.2d at 326 ("[a]s a practical matter, completed acts in accordance with an unstayed order of the bankruptcy court must not thereafter be routinely vulnerable to nullification"); *Best Products,* 177 B.R. at 807 (creditors "absolute failure to even seek a stay has created a situation where it would be wholly inequitable to reverse the Confirmation Order").

### Effective Relief Cannot be Granted

Appellant asserts that "[t]he Bankruptcy Court can easily fashion relief" by returning a portion of $45 million and by excising the releases and waivers of the Causes of Actions. Appellant's Reply at 5. Appellees dispute this and argue that "[a]ny attempt to carve out pieces of the Plan would undermine the carefully constructed bargain that was negotiated," Appellees' Brief at 13, and that "[t]he Settlement is fundamental to the structure of the Plan." *Id.* at 15.

The Settlement was integral to the Plan and the relief requested by Appellant cannot be "easily fashioned." *See, e.g., Texaco,* 92 B.R. at 47–50 ("it is simply untenable to suggest that we should excise the Release Provisions without affecting the settlement and, *ipso facto,* the now-confirmed and consummated reorganization"); *In re Specialty Equip. Co.,* 3 F.3d 1043, 1049 (7th Cir.1993) (releases served "the objectives of the Plan ... by reducing the likelihood of Debtors' becoming involved in costly and time-consuming litigation"). Moreover, as the Settlement was essential in securing the financing "necessary to enable the Debtors to emerge from chapter 11," ROA Doc. 1191 at 7, granting the relief requested by Appellant would both affect the financing obtained and have definite repercussions for the transactions consummated in reliance thereon. *See, e.g.,* Declaration at 2 (senior secured credit facility obtained on the basis of the Settlement "has been syndicated to a number of lending institutions, the proceeds of which are being used to finance the operations of the Reorganized Debtors"). "Consequently, it would be impossible to restore the pre-consummation *status quo* and, therefore ... fashioning effective relief would be both impossible as well as inequitable." *Best Products,* 177 B.R. at 802.

### Relief Sought By Appellant Will Frustrate Debtors' Re–Emergence

"The primary purpose of this or any other Chapter 11 [bankruptcy] ... is to revitalize an ailing debtor to enable it to continue into the future." *In re Fiberglass Indus., Inc.,* 74 B.R. 738, 747 (Bankr. N.D.N.Y.1987). Appellant contends that "[t]he recovery of potentially valuable claims for the benefit of the estates would assist the Debtors' emergence from bankruptcy as a viable entity." Appellant's Reply at 6. This argument is unpersuasive since the Debtors' estate has retained the right to prosecute claims, including those pertaining to the Pre–Petition Restructuring. ROA Doc. 1052 at 33; Appellees' Brief at 15 ("[a]s Sony is one of the Debt-

ors largest and most important suppliers, the Investors deemed it essential that they control the Debtors' claims against Sony, to ensure that nothing would interrupt the flow of films or disrupt the terms on which the Reorganized Debtors obtains films"); ROA Doc. 1191 at 7.

### Unraveling The Reorganization Plan

As reflected in the Disclosure Statement, the Investors committed to funding the Settlement in consideration of the Debtor estates' retention of the exclusive right to prosecute certain claims. ROA Doc. 1052 at 74; *see also* App. ROA Doc. 1261 at 192–93 (the Settlement was "the linchpin of the [P]lan" and the reorganized Debtors' retention "of any estate claims against Sony was an important part of the settlement to [Investors]"). The Chief Financial Officer and Treasurer of LCE testified that without the Settlement, Debtors would have been unable "to put a plan on the table to emerge from bankruptcy," App. ROA Doc. 1261 at 112, or to "structure and get the commitment ... for the $140 million exit facility that could provide [Debtor] with the working capital to emerge with a finance agreement." *Id.* at 110. Thus, as Appellees contend, "[a]bsent the Settlement, the validity of the liens granted to the Pre–Petition Lenders would be in dispute, the distributions to the Pre–Petition Lenders—consisting of the $300 million in equity distributed to the Investors and over $400 million of Restructured Debt—could not be made, and the Investors would not have funded the $45 million for unsecured creditors." Appellees' Brief at 15. *See also In re Public Service Co. of New Hampshire*, 963 F.2d 469, 475 (1st Cir.1992) ("unraveling the substantially consummated ... reorganization plan would work incalculable inequity to many ... who have extended credit, settled claims, relinquished collateral and transferred or acquired property in legitimate reliance on the unstayed order of confirmation").

### B. Confirmation of the Plan (and Approval of the Settlement) Was Not an Abuse of Discretion; And, It Was Supported By the Record and the Law

█ Assuming *arguendo*, that the appeals were not moot, Judge Gropper's determination that "[t]he provisions of the Plan constitute a reasonable, good faith compromise and settlement of all Causes of Action," ROA Doc. 1202 at 10, should not be disturbed. *See, e.g. Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y.1994) ("[t]he experience and knowledge of the bankruptcy court judge is of significance in assessing the propriety of the settlement.").

Appellant contends that approval of the Settlement was "clear error," Appellant's Brief at 20, and that "the record before the Bankruptcy Court did not support approval of the Settlement" as a "reasonable or fair exchange for what was being relinquished." *Id.* at 23. Appellees reply that "the Bankruptcy Court approved a Settlement that was negotiated at arms-length after the Creditors' Committee undertook a thorough investigation into the potential claims being settled," Appellees' Brief at 18, and "considered all of the relevant facts and evidence that were presented at the confirmation hearing and that comprised the record of the chapter 11 cases." *Id.* at 21. There is no basis to conclude that the Bankruptcy Court erred or abused its discretion in approving the Settlement contained in the Plan. *Id.* at 18.

Where, as here, a bankruptcy court's decision to approve a settlement is challenged, a reviewing court will not overturn the decision "unless it is manifestly erroneous and a clear abuse of discretion." *Matter of 47–49 Charles Street, Inc.*, 209 B.R.

618, 620 (S.D.N.Y.1997); *In re Blaise*, 219 B.R. at 950. ("[a] bankruptcy court abuses its discretion if it bases its decision on an erroneous view of the law or clearly erroneous factual findings.").[12]

Judge Gropper's approval of the Settlement was neither an abuse of discretion nor was it legally incorrect (upon a *de novo* examination). There is more than an adequate basis in the record for concluding that the Settlement contained in the Plan was fair and reasonable.[13] Judge Gropper considered, among other things: (i) Six West's objections, which set forth underlying facts of the Pre–Petition Restructuring and the nature of the Insider and Bank Claims, ROA Doc. 1170; App. ROA Doc. 1261 at 203; (ii) that the Creditor' Committee spent "hundreds upon hundreds of hours analyzing the Sony claims, the bank liens, and the bank claims" and that the Committee "took into consideration the value of other claims that [the creditors] were in essence forgiving for the benefit of the [I]nvestors," App. ROA Doc. 1261 at 190–92, 224–26; and (iii) the testimony of the Debtors' Chief Financial Officer indicating that there was no cash flow problem within LCE at the time of the Pre–Petition

Restructuring, *id.* at 97–99. Judge Gropper determined that "there is ample evidence on this record and on the record of similar lawsuits against shareholders that this type of litigation which is a leveraged buyout type of litigation is expensive, and is time consuming, and is uncertain." App. ROA Doc. 1261 at 224. *See, e.g., In re Hibbard*, 217 B.R. 41, 46 (Bankr. S.D.N.Y.1998) ("[t]he complexity, expenses and likely duration of litigations ... place a tremendous burden on all the parties' resources" and claimants "would face serious obstacles in establishing the elements" of their claims).

In approving the Settlement, Judge Gropper properly considered and addressed the Creditors' Committee's decision to support the Plan as well as the overwhelming support of unsecured creditors for the Plan. *See* App. ROA Doc. 1261 at 224–26; ROA Doc. 1202 at 5, 10; *Hibbard*, 217 B.R. at 45 (the favorable reception of a settlement is "further evidence of its fairness"). The Settlement was "the product of arm's length negotiations ... and ... all interests have been effectively represented." *Hibbard*, 217 B.R. at 46 ("[a]s long as the integrity of the negotia-

---

12. "The obligation of the bankruptcy court is to determine whether a settlement is in the best interest of an estate before approving it." *Id.* at 121. The court must "canvass the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness." *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir.1983) (internal quotations and citation omitted). "Moreover, in assessing the fairness of the settlement, a judge does not have to be convinced that the settlement is the best possible compromise or that the parties have maximized their recovery." *Nellis*, 165 B.R. at 123. Rather, "[t]he reviewing court must determine that the value of the proposed compromise distribution is reasonably equivalent to the value of the potential claim which has been surrendered or modified by the settlement which has been achieved." *In re New York, New Haven and*

*Hartford R.R. Co.*, 632 F.2d 955, 960 (2d Cir.1980).

13. Various factors are considered on a Bankruptcy Rule 9019 motion, including: (1) the probability of success in the litigation; (2) the difficulties associated with collection; (3) the complexity of the litigation, and the attendant expense, inconvenience, and delay; and (4) the paramount interests of the creditors. *Nellis*, 165 B.R. at 122. Courts should also consider, among other things, the proportion of class members who do not object or who affirmatively support the proposed settlement, the competency and experience of counsel who support the settlement, the extent to which settlement is the product of arm's length bargaining, and "the opinions of the trustee or debtor and their counsel that the settlement is fair and equitable." *Id.*

tion process is preserved, a strong initial presumption of fairness attaches to the proposed settlement").[14] "The fact that the [creditors] will redeem only a portion of potential recovery" does not in and of itself make the Settlement either unfair or inadequate, *Hibbard,* 217 B.R. at 47, nor is there anything "in the law which requires that [creditors] in a bankruptcy proceeding receive a full recovery through a settlement." *Nellis,* 165 B.R. at 125. *See also In re Agent Orange,* 818 F.2d 145 (2d Cir.1987); *Weinberger v. Kendrick,* 698 F.2d 61, 65 (2d Cir.1982); *see also* App. ROA Doc. 1261 at 27–28, 109–11, 190–95; ROA Doc. 1191 at 7.

It appears that "Appellant's misperceive a bankruptcy court's obligations ... Although a judge must consider the fairness of the settlement to the estate and its creditors, the judge is not required to assess the minutia of every claim." *Nellis,* 165 B.R. at 123 (rejecting appellants' contention that the "bankruptcy court did not have sufficient information about the individual claims resolved by the settlement agreement to assess properly its fairness to the appellants and other creditors"); *see also In re Ashford Hotels, Ltd.,* 226 B.R. 797, 802 (Bankr.S.D.N.Y.1998) (it is "not necessary ... to conduct a 'mini trial' to determine the merits of the underlying litigation. Rather, the court's responsibilities are to 'familiarize itself with all facts

necessary for an intelligent and objective opinion, canvass the issues, and see whether the settlement falls below the lowest point in the range of reasonableness' ") (quoting *In re W.T. Grant,* 699 F.2d at 608). "[T]he question is whether the decision to settle is reasonable." *In re Drexel Burnham,* 134 B.R. 499, 507 (Bankr. S.D.N.Y.1991).[15]

■ The Court also finds that Judge Gropper properly denied Appellant's motion for the appointment of an independent examiner. "[I]n accordance with the plan[,] the examiner can only be appointed before confirmation, and a creditor cannot wait until the confirmation hearing to seek an examiner and expect one the be appointed at that time. When an examiner is sought at that late date, the Courts have found that the creditor has implicitly waived any right to have an examiner." App. ROA Doc. 1261 at 220; *see In re Bradlees Stores, Inc.,* 209 B.R. 36 (S.D.N.Y.1997).

## C. The Deposition Testimony Offered by Appellant was Inadmissable

■ Appellant argues that the Bankruptcy Court improperly excluded deposition testimony of Sony's Corporate Controller, Nobuyuki Oneda, "to show there is

14. The record included, among other things: (i) Debtors' Disclosure Statement which stated that the "Creditors' Committee determined that a $45 million Cash distribution provided significantly greater value to the Holders of General Unsecured Claims than the value that would have been realized by obtaining a minority equity position in the Reorganized Debtors and through the pursuit of claims," ROA Doc. 1052 at 33; and (ii) supporting testimony from the managing director of Lazard & Freres. App. ROA 1261 at 114–23.

15. The confirmation hearing transcript reflects that Judge Gropper was familiar with

the underlying facts of the potential claims, *see* App. ROA Doc. 1261 at 203, 220–21, 223–24; ROA Doc. 1170, and that he employed the correct analysis to determine the Settlement's reasonableness. As Judge Gropper stated, "the issue is not whether ... there are or aren't claims against Sony, [but whether] ... the settlement is reasonable whereby the creditors gave up a speculative recovery either of an equity interest in a reorganized debtor ... or if there were some other consideration in return for a share of cash to be paid immediately." *Id.* at 225.

reason to investigate the Insider Claims and Bank Claims further." *Id.* at 26. Judge Gropper determined that the testimony was hearsay and that Appellant sought "to introduce the testimony for the truth of a certain proposition," i.e., that Sony had knowledge of Debtors' insolvency. ROA Doc. 1261 at 169–70. Following an *in camera* review, Judge Gropper refused to admit the testimony into evidence. *Id.* at 216–18.

The Court has reviewed this issue *de novo, see Fischer,* 202 B.R. at 345, and concludes that Judge Gropper was correct. The testimony at issue was offered, among other things, to demonstrate that Sony had knowledge of the Debtors precarious financial position. *See* Appellant's Brief, Ex. 2 (Deposition Transcript of Nobuyuki Oneda dated February 28, 2001) at 64–65, 68–70. The testimony was properly excluded as hearsay. App. ROA Doc. 1261 at 169–70, 216–18. The Court agrees with Judge Gropper's conclusion that there is no applicable hearsay exception, *id.* at 216–18, and finds Appellant's argument that the testimony falls under Fed.R.Evid. 804(b)(3) unpersuasive.[16] First, Appellant did not establish that Mr. Oneda was "unavailable" to testify at the confirmation hearing. App. ROA Doc. 1261 at 168 (Six West merely argued that "[t]he witness is located in Japan, so he is unavailable"). Second, "[t]here is no indication whatsoever ... that ... the statements were actually against the declarant's interest." App. ROA Doc. at 217. *See Warner Bros. v. First Fashion & Variety, Inc.,* 1987 WL 7743, at *1 (S.D.N.Y. Mar.3, 1987).[17]

### IV. Conclusion

For the foregoing reasons, the appeals in 01 Civ. 3703 and 01 Civ. 3705 from the decision of the Bankruptcy Court are hereby dismissed.

**16.** Fed.R.Evid. 804(b)(3) provides an exception to hearsay if: (i) the declarant is unavailable under 804(a)(1)-(5); and (ii) the statement "which was at the time of its making [is] so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil ... liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true...."

**17.** The Court has considered all issues raised by the parties on this appeal, including those which are not specifically discussed in this Order.